**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Michael T. KORANDO, Defendant–
Appellant.**

**No. 93–2749.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 24, 1994.

Decided July 6, 1994.

Norman R. Smith, Asst. U.S. Atty., Criminal Div., Fairview Heights, IL (argued), for plaintiff-appellee.

J. William Lucco, Lucco, Brown & Mudge, Edwardsville, IL (argued), for defendant-appellant.

Before FAIRCHILD, CUDAHY and RIPPLE, Circuit Judges.

CUDAHY, Circuit Judge.

Michael Korando appeals his conviction for conspiring to violate RICO. He was acquitted on the other two counts of the three-count indictment. Count I charged a RICO violation, alleging that Korando participated in the conduct of an enterprise through a pattern of racketeering activity in violation of the Racketeer Influenced and Corrupt Orga-

nizations statute (RICO). 18 U.S.C. §§ 1961–1968. The indictment listed seven predicate acts of racketeering: six arsons and one murder. Count II (on which he was ultimately convicted) charged Korando with conspiring to violate RICO (by *agreeing* to conduct the affairs of an enterprise through the same pattern of racketeering activity alleged in Count I). Count III charged Korando with committing a violent crime in aid of racketeering, namely the same murder that was one of the seven underlying predicate acts of the alleged RICO violation.

After trial, the jury—in a special verdict—found that Korando actually committed only one of the seven acts of racketeering, one of the alleged arsons. Because two acts are needed to comprise a "pattern of racketeering activity," the jury acquitted Korando on Count I. But the jury found that Korando *agreed* to commit a second arson, and therefore (coupled with the first arson—that the jury also found he "agreed" to commit), returned a guilty verdict on Count II. Having found that Korando did not commit the charged murder, the jury acquitted on Count III.

Korando here appeals his conviction on Count II, claiming primarily that the evidence of an "enterprise" is insufficient to support the jury's verdict. He also launches a constitutional challenge to RICO, and attacks his sentence.

I

The government's theory at trial was that Korando was a henchman in a small outfit specializing in insurance fraud—"murder and arson for profit," as the government described the operation in making its closing argument to the jury. John Buskohl—owner of Frontier Realty in Chester, Illinois—was alleged to be at the center of this clique. In addition to Korando, Buskohl allegedly had a handful of other men who would actually carry out the operation's work, and would receive a share of the profit. These others included Steve Hecht, who ran a construction firm, as well as Tom Kopshever and Richard Kriete, both of whom had worked with Buskohl years earlier when the three were in the insurance business.

Most of the evidence introduced in Korando's trial centered on the government's allegation that Korando murdered Donald Ray Clark II by bludgeoning him with a metal pipe. This murder was ostensibly the culmination of a plan that Kopshever and Buskohl cooked up. .The idea was that Kopshever (who owned a marketing company) would hire someone, insure his employees (including this new hire) under a "pension plan" of which he would become the primary beneficiary and then murder the employee and collect the proceeds.

Donald Clark II was chosen as the victim of this scheme. He and Korando were estranged friends. After Buskohl told Korando about his scheme, Korando allegedly approached Clark, and told him about a great new job that had just opened up at Kopshever's marketing company, and urged him to apply. In June 1989 Clark began working as a salesman for Kopshever. He was murdered on July 4, 1989.

In addition to this murder, the government charged that Korando committed a half-dozen arsons, intentionally setting fire to: (1) John Theriac's residence in January 1987 (Racketeering Act Number 5); (2) Alan Aspley's residence in June 1987 (Racketeering Act Number 10); (3) Nolan Hettesheimer's residence in August 1987 (Racketeering Act Number 6); (4) the Hecht Construction Company trailer in April 1989 (Racketeering Act Number 3); (5) Ray Spencer's residence in May 1989 (Racketeering Act Number 7); and (6) the Old Gauldoni Farm in January 1991 (Racketeering Act Number 2).

But the jury found that the government did not prove Korando's involvement either in the murder, or in four of the six arsons he allegedly committed. Rather, in its special verdict, the jury indicated that the government proved that Korando was actually involved only in one act of arson—the Hecht Construction Company trailer fire. But the jury also found that Korando "agreed" to participate (for the purposes of Count 2, the conspiracy to violate RICO) in two arsons—the burnings of the Hecht trailer fire and of Alan Aspley's residence. The jury reached this conclusion despite the testimony of

Hecht, who told the jury that he saw Korando kill Clark by beating him with a metal pipe, and of Kriete, who testified that he met several times with Korando and Buskohl to discuss their plan to murder Clark.

The jury did, however, find that Korando agreed to commit the two arsons. With respect to the burning of the Hecht trailer, Steve Hecht testified that he and Buskohl talked—about a week before the arson took place (in April 1989)—about burning a trailer owned by Hecht's construction company, used to store tools and materials. Buskohl allegedly told Hecht that he had someone who would burn the trailer, and the day before the arson further told Hecht that this "someone" was Korando. Buskohl also told Hecht that he and this other person would split ten percent of the insurance proceeds. After the trailer was destroyed by fire, Hecht wrote Korando a check for $1,700.

And with respect to Korando's agreeing to participate in the burning of Alan Aspley's home, Aspley (who worked with Korando at the Southern Illinois Sand Company) testified that Korando approached him and asked whether Aspley would be interested in purchasing a trailer—until then owned by Buskohl—in order to burn it down and collect on the insurance. Aspley agreed to do so, and testified that a few months after he "purchased" the trailer (though he said that he paid nothing for it), he moved some old clothes and, with Korando's help, some furniture, into the trailer. He then took out an insurance policy with $100 that Korando gave him, and after the trailer burned down, received $17,000 in insurance proceeds. He endorsed those checks over to Buskohl, who in turn paid Aspley approximately $2,000.

## II

### A

Korando's primary argument on appeal is that the evidence was insufficient to find that he had conspired to violate RICO. We note at the outset that while the jury here found that Korando agreed to commit two predicate acts, all that is required is that a defendant agree to operate an enterprise, and that the enterprise be conducted through the commission of two predicate acts. There is no requirement in this circuit that the defendant actually agree to commit two predicate acts. *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.), *cert. denied*, 479 U.S. 939, 107 S.Ct. 421, 93 L.Ed.2d 371 (1986).

But Korando's sufficiency of the evidence challenge focuses on a separate RICO requirement, the existence of an enterprise. RICO makes it unlawful for "any person employed by or associated with any enterprise ... to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity ..." 18 U.S.C. § 1962(c). And an "enterprise" is defined as any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

Buskohl and his loose band of associates were thus accused of being a "group of individuals associated in fact although not a legal entity" for the purposes of defining the "enterprise." While the statutory definition includes enterprises that exist solely in order to carry out illegal activity, *United States v. Turkette*, 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981), the enterprise needs to be something more than just the pattern of racketeering activity. "Otherwise two statutory elements—enterprise and pattern—would be collapsed into one." *United States v. Masters*, 924 F.2d 1362 (7th Cir.), *cert. denied*, 500 U.S. 919, 111 S.Ct. 2019, 114 L.Ed.2d 105 (1991).

The hallmark of an enterprise is a "structure." *Neapolitan*, 791 F.2d at 500. The import of this requirement is that the enterprise, to be an enterprise, needs to have "a structure and goals separate from the predicate acts themselves." *Masters*, 924 F.2d at 1367. We have noted, though, that RICO applies not only to formal enterprises, but also to informal ones like criminal gangs. "There must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much." *Burdett v. Miller*, 957 F.2d 1375, 1379 (7th Cir.1992). We have also noted that the continuity of an informal enterprise, and the differentiation of

roles can provide the necessary "structure" to satisfy RICO's statutory requirement. *Id.*

The jury was therefore properly instructed that an "enterprise must have a structure and goals separate from the commission of the predicate acts themselves," and that such "an association of persons may be established by evidence showing an ongoing organization, formal or informal, and by evidence that the people making up the association functioned as a continuing unit."

 Korando therefore takes no issue with these instructions, challenging only the evidentiary sufficiency. In a sufficiency of the evidence challenge, a court is asked only to determine whether a reasonable jury, based on the evidence presented at trial, could have found the element in question to have been satisfied beyond a reasonable doubt. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Crockett,* 979 F.2d 1204, 1212 (7th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1617, 123 L.Ed.2d 176 (1993). In making this determination, we are to review the evidence in the light most favorable to the government, and draw all reasonable inferences in its favor. Korando therefore faces an uphill battle. We are to affirm so long as there is enough evidence in the record to allow a reasonable jury to conclude—drawing every reasonable inference in the government's favor—that there was some (though again there need not be much) structure to this alleged enterprise. We find that the government has (though only barely) cleared this very low hurdle.

The government's attempts to explain the "structure" of this enterprise, both to the jury and before this court, have been decidedly less than elegant. In its closing argument to the jury, the government's argument went as follows:

> You recall there is a structure to this group. You recall the meetings that often occurred at Frontier Realty. John Buskohl is like the hub of this wheel. You recall that he's the one out scouting properties that could be ripe for burning or good to acquire and insure and have them paid. You recall it's Frontier Realty that lists Nolan Hettesheimer's house. It's list-ed for a period of time. Doesn't sell. They know there's an opportunity there. You recall John Theriac's residence was listed by Frontier Realty. Didn't sell for a period of time. They knew he would be a candidate. That house was burned for the insurance proceeds.
>
> Further recall, also recall John Buskohl using Frontier Realty and his knowledge as a realtor to structure sham contract[s] for deeds. Notice the common pattern. Alan Aspley, June 25th, 1987, a sham contract for deed. Alan Aspley didn't buy that property. He never lived there, never made any payment.
>
> The [Gauldoni] farm property, you recall that farm on January 7th of 1991. Steven Hecht never contributed any money. That was a sham contract for deed. He never lived there before the fire. There is a structure which John Buskohl is the hub of the wheel. . . .
>
> Let's go onto the second element of RICO . . .

Transcript (April 21, 1993) 3–5.

That strikes us as close to gibberish. If we were asked here whether—looking only at the evidence to which the government drew the jury's attention during its closing argument—there was a sufficient evidentiary basis for a reasonable jury to return a conviction, we would likely conclude that there was not. But this is not our role. Instead we are to affirm as long as, somewhere in the record, sufficient evidence can be found. Our review of that record suggests that it can.

The government's appellate brief does a somewhat (though not all that much) better job of marshalling this evidence. The government now contends that the "enterprise in the instant case had a loose but discernable structure," with Buskohl—through his realty business—finding property to burn. Br. at 22. He would place the property in the names of straw parties. Korando's role in all of this was (1) to help find the properties, (2) to help find the people in whose name to place the properties and (3) actually to burn the properties down. In addition, Steve Hecht, through his construction company,

would rebuild the properties following the arsons.

The evidence adduced at trial can be read to support such a theory. While this is not much of a structure, the division of labor that we emphasized in *Burdett* does appear to be present. And there is also evidence that this "enterprise" persisted over a period of many years, which is also a factor to which *Burdett* draws our attention. Though this is a close question, we conclude that a rational jury could find that this arrangement had a "structure" as that word is understood in this context. It therefore could have found the existence of an "enterprise," a necessary element of a RICO conviction.

### B

■ Korando next argues that there was insufficient evidence that he "agreed" to participate in the enterprise. But Hecht and Kriete both testified to Korando's active participation in discussions where criminal activity was planned. Korando argues here that Hecht and Kriete should not be believed. This contention is all but irrelevant for our purposes. We do not second-guess the jury's credibility determinations nor do we weigh the evidence ourselves. While the jury apparently disbelieved some of Hecht's and Kriete's testimony, the conviction on the conspiracy count suggests that they accepted the claim that Korando agreed to the commission of two of the predicate acts. So long as there is sufficient evidence in the record to allow a reasonable jury to find that Korando agreed to participate in the enterprise, we are to affirm. The evidence of agreement in this case is undoubtedly sufficient.

### III

■ Korando next argues that RICO is unconstitutional in that it does not define the criminal offense with sufficient clarity such that ordinary people understand what is allowed and what is forbidden. Such a level of clarity is a requirement of due process of law. *Bouie v. Columbia*, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964). But we addressed precisely this argument in *Masters*, 924 F.2d at 1367, and held that RICO was not unconstitutionally vague. RICO is a

remedial statute only. It does not make criminal activity that is otherwise legal; it only increases the sanction for engaging in activity that is already forbidden. Therefore, "[p]rovided the statutes criminalizing the predicate acts are not unconstitutionally vague—and no one argues they are—the defendants are on adequate notice that they are committing crimes, and the fact that they may not be aware of the extent of their criminality and consequent exposure to punishment is a detail." *Id.* Korando supplies us with no reason to question this conclusion.

### IV

The final objection that Korando raises is a three-part attack on his sentence.

### A

■ First, he says that the court improperly found the base offense level to be 24. It reached that conclusion by relying on U.S.S.G. § 2K1.4 (the arson provision), which says that the offense level is 24 if the offense "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly."

This provision went into effect November 1, 1990. Korando argues that because this provision is harsher than the one in effect in 1987 and 1989, the dates when he committed the two arsons that are the predicate acts for the his RICO conspiracy conviction, application of the Guideline that later became effective violates the ex post facto clause.

The Guidelines themselves indicate that the court should apply the Guideline Manual in effect on the date the defendant is sentenced, unless the ex post facto clause requires the court to use the Guideline Manual in effect on the date that the offense of conviction was committed. U.S.S.G. § 1B1.11. It is true that we have recently held that the application of a more severe Guideline than the one in effect when the defendant committed his crime represents a violation of the ex post facto clause. *United States v. Seacott*, 15 F.3d 1380, 1384–86 (7th Cir.1994). But the Guidelines commentary

further provides that if the dates for a series of offenses straddle a change in the Guidelines, the date of the last offense should control. Our cases have therefore consistently held that where a harsher Guideline becomes effective during the course of a conspiracy, a defendant who does not withdraw from the conspiracy before the effective date of the more severe Guideline should be sentenced pursuant to the more recent Guideline. *E.g., United States v. Jackson,* 983 F.2d 757, 771 (7th Cir.1993).

Because Korando did not object to the use of the 1992 Guidelines Manual, we review this challenge only for plain error, *Seacott,* 15 F.3d at 1386, which requires a showing of prejudice. But even if there were evidence that Korando withdrew from the conspiracy in 1989 (which there is not), the Guidelines then in effect provided for a base offense level of 6, but an increase of 18 levels if "the defendant knowingly created a substantial risk of death or serious bodily injury." Application of this provision would have left Korando with a base offense level of 24, exactly what the 1992 Guidelines Manual called for. Korando can therefore show no prejudice; the application of the 1992 Guidelines Manual (if erroneous at all) does not represent plain error.

**B**

 Because the court determined that each arson represented a separate unit, it added two levels to the base offense level. U.S.S.G. § 3D1.4. Korando argues that this is erroneous, and that the court should simply have treated the entire matter as a scheme to defraud the insurance companies and determined the base offense level under U.S.S.G. § 2F1.1. But it seems to us that the court correctly applied the Guidelines, determining first that the conspiracy to violate RICO should be treated as a completed RICO violation, U.S.S.G. § 2X1.1. The court therefore looked to the racketeering Guideline, U.S.S.G. § 2E1.1, which in turn directed the court to look to the offense level applicable to the underlying racketeering activity. Here, the racketeering activity was determined to be two separate arsons, and the

court sentenced Korando accordingly. We discern no error.

**C**

 Korando finally argues that it was inconsistent for the court to waive Korando's fine due to his inability to pay, but to nonetheless order him to pay full restitution. Our opinion in *United States v. Berman,* 21 F.3d 753, 758 (7th Cir.1994), suggests a number of reasons why a court might excuse a fine while still ordering restitution, despite our holding in *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993), that the imposition of a fine is mandatory. But *Berman* noted that such reasons must be furnished by the district judge, and that (as in this case) where they are not, the matter needs to be remanded for an explanation. *Berman,* 21 F.3d at 759. We therefore VACATE the imposition of restitution, and REMAND the matter to the district court. In all other respects the judgment of the district court is AFFIRMED.