In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3773
United States of America,

Plaintiff-Appellee,

v.

Salvador A. Vivit,

Defendant-Appellant.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 98 CR 157 01--James B. Zagel, Judge.

Argued April 10, 2000--Decided June 6, 2000

Before Easterbrook, Kanne and Rovner, Circuit Judges.

Kanne, Circuit Judge.  A jury found Salvador
Vivit, a medical doctor, guilty of sixteen counts
of mail fraud based on a scheme in which he and
his patients submitted false claims to insurance
companies that grossly overstated the amount of
care he had provided. The district court
sentenced Vivit to seventy-two months
imprisonment for these offenses. On appeal, Vivit
does not contest the convictions, but he claims
that the district court committed numerous errors
in determining the appropriate sentence. Finding
no errors in Vivit's sentence, we affirm the
decision of the district court.

I.  History

   Salvador Vivit operated the Family Medical
Center, a one-doctor clinic located in Elmwood
Park, Illinois. At the Family Medical Center,
Vivit employed only two other individuals,
Estrella Del Moral, who worked as a receptionist,
did filing and sometimes provided physical
therapy to Vivit's patients, and Adriano "Andy"
Apostol, his partner, who processed and filed
insurance claims for Vivit.

   Vivit and Apostol had founded the clinic
together in 1993, with Apostol providing about
$7,000 in start-up money and equipment. However,
because Vivit was the only licensed doctor, he

ran the clinic as a sole practitioner. Vivit recruited patients and performed medical treatment, while Apostol processed and filed insurance claims for him and used the office as a base for other shady business ventures. In September 1994, Vivit and Apostol had a disagreement. Apostol then quit and removed many items from the clinic, including the clinic's computer, a television, a chair and 134 boxes of patient files documenting the clinic's accident victims. These patient files were given by Apostol to the Elmwood Park Police department, who investigated and eventually arrested Vivit. Shortly after removing this equipment from the clinic, Apostol departed for the Philippines, where he remains.

Between 1993 and 1996, Vivit involved as many as 130 patients in a complicated scheme to defraud insurance companies by charging for services that he did not provide. Vivit engaged in five principal types of fraudulent conduct: (1) billing insurers for patient visits that did not occur; (2) billing for physical therapy that was not performed; (3) creating false medical records and reports to submit to insurance companies; (4) allowing his unlicensed assistant, Del Moral, to perform physical therapy without Vivit's supervision while he charged for therapy performed by a licensed therapist; (5) ordering unnecessary allergy tests for patients with no allergy symptoms.

Based on the information in Vivit's files obtained from Apostol, interviews conducted with Vivit's patients and claims filed by Vivit or his patients to their insurers, the government obtained enough evidence to secure a four-count indictment in July 1998. In December 1998, a new grand jury returned a seventeen-count superseding indictment charging Vivit with devising and executing a scheme to defraud. The indictment alleged that Vivit engaged in fraudulent use of the mails on seventeen separate instances between 1993 and 1996, and the final count of the indictment claimed that one check was mailed in furtherance of the conspiracy as late as August 6, 1996. On June 29, 1999, the district court conducted a jury trial to consider the charges against Vivit.

At trial, the government produced the testimony of twenty-six former Vivit patients and entered into evidence false bills and medical reports created for forty-nine patients. Each of the testifying patients had in some way been involved in Vivit's scheme to defraud their insurers. Some, including Roy, Myla and Lauro Sansano, merely filled out false attendance sheets at Vivit's request. However, the Sansanos testified

that they back-dated many of the signatures to conceal a considerable lapse of time between when the accident from which they claimed injuries occurred and their initial visit to Vivit, belying Vivit's claim that the attendance sheets were used to make future appointments. In addition, Roy Sansano testified that they visited Vivit because a friend told him that to receive a favorable insurance settlement, they should see Vivit, a doctor who would produce false medical documentation to support their claim.

Other patients testified about more extensive fraudulent conduct. For example, Veronica Leighton testified that she received $53,000 as a result of filing a false disability insurance claim. Leighton, who pleaded guilty to tax evasion and mail fraud for her crimes, first submitted a false medical bill to her insurer based, in part, on twenty-nine fictitious visits to Vivit's clinic for which Vivit created a record. Leighton decided that she also should seek disability benefits, and she testified that Vivit told her how to prepare a fraudulent claim for her disability insurer. In conjunction with this fraud, Vivit filled out a certificate of disability swearing that in his medical opinion Leighton was disabled.

Many other patients testified that, in addition to overbilling by creating a false attendance record, Vivit exaggerated the amount of treatment that he performed. Vivit's records showed that he had performed ultrasound therapy on numerous patients in 1993, but the government produced the supplier of Vivit's ultrasound machine, who testified that the machine was not delivered until the spring of 1994. In addition, Vivit's files show that he performed an examination and two follow-up examinations on Sharlon Silvestre, but Silvestre testified that Vivit never examined him. Vivit also included a diagnosis of whiplash and migraines in his medical record, but Silvestre testified that he did not have headaches and that Vivit never informed him that he suffered from whiplash. Vivit's files also show that he performed therapy on Jennifer Cailles's back and neck. Cailles, who was sixteen at the time when she was treated by Vivit, testified that this therapy was never performed. In addition, many other patients added testimony to the record similar to that offered by Silvestre and Cailles.

Other patients testified that Vivit failed to provide adequate medical services in the course of his care. Avelina De La Rosa testified that she had extremely high blood pressure following an automobile accident, but Vivit failed to test her blood pressure during the course of his

diagnostic examination. Melandro Lubguban testified that he visited Vivit in pain following an automobile accident, but Vivit failed to examine him at all. Phina Garcia testified that she was covered with bruises when she visited Vivit, but Vivit did not examine her and instead approved hydro collator treatments for her, a treatment plan that medical experts advised against.

Del Moral also testified for the government, stating that she had performed "microphone" (ultrasound) therapy, hydro collator therapy and electrical muscle stimulation therapy on numerous patients without Vivit's supervision. She testified that the unsupervised therapy occurred largely because Vivit arrived at the clinic in the afternoon, and Del Moral performed one or two therapy sessions each morning. Although she lacked a license to perform physical therapy, she claimed that Vivit had trained her and that she was taking courses on therapy. Del Moral also testified that Vivit told her to make his patients falsify attendance sheets to inflate the amount of therapy they supposedly received. Del Moral testified that Vivit prepared patient bills, sometimes with the aid of Apostol, and gave them to her to file and mail.

The government also presented the testimony of two experts, Drs. Daniel Samo and Gregory Mulford. Both doctors testified that the therapy that Vivit prescribed would be useless without an additional prescription of a course of exercise. They also testified that Vivit's failure to examine patients constituted a "hideous" dereliction of duty and that the prescription of hydro collator or electrical muscle stimulation therapy to patients with bruising was contraindicated. Finally, the doctors provided expert analysis about the amount which Vivit's fraudulent claims of treatment cost various insurers. Both experts testified that because all the treatment prescribed by Vivit was unnecessary, the entire amount of his bills should be considered fraudulent.

On the basis of this evidence, the jury returned a guilty verdict against Vivit on sixteen of the seventeen counts of the indictment. The district court sentenced Vivit in October 1999. Because it found that the convictions all involved substantially the same harm, the court chose to group all the convictions, pursuant to United States Sentencing Guidelines sec. 3D1.2. The total offense level of the combined counts started at level six as directed by sec. 2F1.1(a), but the court increased the total offense level to thirteen because it found that the government had proved

that, in aggregate, Vivit had defrauded insurers of between $120,000 and $200,000.

The government originally argued that Vivit had defrauded insurers of $265,618.80, of which about $60,000 should have been removed for legitimate pain and suffering of Vivit's patients. However, Vivit argued that the actual loss was much less because of the medical services that he provided. The parties argued extensively over the computation of loss, and the government, in support of its position, presented the court with a "Vivit loss chart" that listed all the costs associated with fraudulent billing by Vivit. This chart showed that Vivit had submitted bills containing fraudulent information valued at about $149,000, to which insurers paid out nearly $130,000, but the chart did not subtract the value of legitimate medical services performed by Vivit. The court found this chart persuasive and eventually attached the chart to its ultimate judgment. After listening to the parties' extended discussion on the calculation of amount of loss, the court concluded, "I think it is quite clear from the papers before me and from the trial and from the testimony, that a loss of at least $100,000 was proved. I am inclined to believe that more than $200,000 was proved, but relying on what I believe is most appropriate for this case, and that which cannot be questioned, I find that we have to add seven points rather than eight to the total offense level."

From a total offense level of thirteen, the court ultimately enhanced Vivit's total offense level to twenty-seven. The court initially raised the total offense level two levels pursuant to sec. 2F1.1(b)(6)(A) because the court found that Vivit's treatment recklessly placed his patients at serious risk of bodily injury. The court explained that "what [Vivit]'s position in this court is 'you know, I really didn't do very much. I used the most conservative treatment.' . . . But the fact of the matter is that the most conservative treatment is not always best. . . . [H]e was, given his medical examination practices, a very lucky man that he did not miss something more serious, and for all we know maybe he did."

The court enhanced four levels pursuant to sec. 3B1.1(a) for Vivit's role as an organizer or leader, basing its decision that Vivit led five other participants on the facts set out in the Pre-Sentencing Investigation and Report ("PSR"), and two additional levels because Vivit abused his position of trust relative to insurers, pursuant to sec. 3B1.3. In relation to the latter enhancement, the court noted that it enhanced Vivit's sentence not because of his use of a

special skill, which the court felt would constitute double-counting in relation to its vulnerable victim enhancement, but because "it is fair to say that he counted upon that the insurance companies would extend trust to him, and certainly after a period of time doing this it is quite clear that he understood that they did trust him; so that he did abuse his trust relative to the insurance companies."

In addition, the court enhanced Vivit's sentence by two levels pursuant to sec. 3A1.1(b) because many of his patients constituted vulnerable victims and an additional two levels according to sec. 3B1.4 for using minors to commit an offense. Finally, the court enhanced two more levels because Vivit's scheme intended to defraud more than one victim, pursuant to sec. 2F1.1(b)(2). Adding all these enhancements, Vivit's total offense level reached twenty-seven. Because Vivit's criminal history category was I, this total offense level created a sentencing range of 70 to 87 months. The district court sentenced Vivit to 72 months imprisonment, followed by three years supervised release. Vivit also was ordered to pay $149,877 in restitution.

II.  Analysis

On appeal, Vivit challenges his sentence on five grounds. First, Vivit claims that the district court erred in calculating the loss amount caused by his scheme. Second, Vivit finds error in the court's determination that he used minors in his scheme and in its application of this enhancement in light of potential ex post facto concerns. Third, Vivit claims that the court erred in determining that his treatment recklessly subjected his patients to a risk of serious bodily injury. Fourth, Vivit challenges the district court's attribution of a leadership role to him for his conduct in the scheme. Fifth, Vivit challenges the district court's enhancement to his sentence for abuse of a "position of trust" in relation to the insurance companies that he defrauded.

A.  Calculation of Loss

At sentencing, the government and the probation office provided a "loss assessment" for the harm caused by Vivit as totalling $265,618.80. However, the district court found that the government was able to prove a loss of only $120,000 to $200,000. On this basis, the court enhanced Vivit's sentence seven levels, pursuant to United States Sentencing Guidelines sec. 2F1.1(b)(1)(H). On appeal, Vivit claims that the district court erred in its calculation of loss because the court failed to subtract the value of

the legitimate medical services rendered from the loss incurred by the insurance companies and because the court's calculation of loss included evidence of fraud of which there was no testimony at trial or sentencing. The definition of loss is a question of law, reviewed de novo. See United States v. Holiusa, 13 F.3d 1043, 1045 (7th Cir. 1994). The amount of loss calculated by the district court is a finding of fact, which we review for clear error. See United States v. Craig, 178 F.3d 891, 899 (7th Cir. 1999). We find clear error only when we are "left with the definite and firm conviction that a mistake has been made." United States v. Strache, 202 F.3d 980, 984-85 (7th Cir. 2000) (citation omitted).

Guidelines sec. 2F1.1(b)(1) directs sentencing courts to increase the defendant's total offense level according to the total amount of loss created by a defendant's actions, if that loss exceeds $2,000. U.S.S.G. sec. 2F1.1(b)(1). Application note 8 to sec. 2F1.1 indicates that the valuation of loss for the purposes of sec. 2F1.1 will be determined in the same fashion as for sec. 2B1.1 (theft). U.S.S.G. sec. 2F1.1 application note 8. Application note 2 to sec. 2B1.1 defines loss as "the value of property taken, damaged, or destroyed." U.S.S.G. sec. 2B1.1 application note 2. However, application note 8(a) to sec. 2F1.1 provides that when a fraud is committed by misrepresenting the value of an item that has some value, courts should value the loss at the amount by which the item was overvalued, that is, the difference between the represented value and the actual value. U.S.S.G. sec. 2F1.1 application note 8(a).

The valuation of loss "need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." U.S.S.G. sec. 2F1.1 application note 9. Guidelines sec. 2F1.1(b)(1) provides that courts should enhance the defendant's total offense level by at least eight points if a loss greater than $200,000 is proved, by only seven points if the total loss lies between $120,000 and $200,000, and by six or less points when the loss is less than $120,000. U.S.S.G. sec. 2F1.1(b)(1)(A)-(I). At sentencing, the parties engaged in an extended discussion about the proper valuation of loss to attribute to Vivit's scheme, in which the government claimed a loss valuation of greater than $200,000 and Vivit claimed a loss of less than $120,000. At the close of this discussion, the district court determined that "I think it is quite clear from the papers before me and from the trial and from the testimony, that a loss of at least $100,000 was proved. I am inclined to believe that more than $200,000 was proved, but relying

on what I believe is most appropriate for this case, and that which cannot be questioned, I find that we have to add seven points rather than eight to the total offense level."

The parties disagree whether any of Vivit's services should be netted against the bills that he provided to insurers for his services. Vivit notes that we measure the amount of net detriment to the victim in calculating the amount of loss, rather than the total amount of money transferred. See United States v. Mount, 966 F.2d 262, 265 (7th Cir. 1992). However, the government contends that none of the services performed by Vivit was medically necessary, and the great majority of the services billed were not even performed, making those services performed the type of action made only to give the appearance of legitimacy. In support of its contention, the government cites the case law of another circuit which provides that "if the 'value' to the victim is merely a part of the fraudulent scheme, the defendant is not entitled to a credit." United States v. Sayakhom, 186 F.3d 928, 947 (9th Cir. 1999). However, the court in Sayakhom also noted that "in calculating loss, the district court should give credit for any legitimate services rendered to the victims." Id. at 946.

Application note 8(a) to sec. 2F1.1 reminds courts that in frauds where the item misrepresented has some value, the value of this item should be netted against the price offered to determine the amount of loss. While we have traditionally applied this netting theory in the fraudulent sale of goods, see United States v. Schneider, 930 F.2d 555, 558 (7th Cir. 1991), we have also applied this theory to the fraudulent misrepresentation of other items of value, when some value has actually been transferred. See United States v. Jackson, 95 F.3d 500, 505-06 (7th Cir. 1996). Despite the government's contention that the overwhelming majority of Vivit's billing was based on unperformed or unnecessary services, the evidence presented demonstrates that Vivit did perform some legitimate medical services. For this reason, we calculate the amount of loss suffered by the insurers by netting the total costs submitted by Vivit, minus the legitimate medical services that he provided.

However, we find no evidence in the record for Vivit's main contention on appeal, that the district court failed to perform this cost-netting in calculating the amount of loss caused by Vivit's fraud. The government urged the court to adopt an amount of loss that the government conservatively placed at greater than $200,000, based on the $265,000 paid out by insurers less

the legitimate claims of Vivit's patients. The court felt that a loss greater than $200,000 had probably been proved but decided to sentence Vivit conservatively, finding that the government had not clearly established a loss of $200,000. As a benchmark, the court used the "Vivit loss chart," which calculated Vivit's fraudulent billing at approximately $150,000, of which insurers paid nearly $130,000. The court seems to have determined that the Vivit loss chart accurately reflected the amount of loss established by the government for the purpose of determining the sec. 2K1.1(b)(1) enhancement.

Unsatisfied by the court's decision, Vivit claims that the Vivit loss chart lacks any basis in fact, because the chart fails to net out the legitimate services provided by Vivit. However, Vivit fails to recognize that the chart was composed only of those bills in which fraudulent information was submitted. In addition to showing the total amount of loss, the chart shows the ratio of legitimate services provided to fraudulent services claimed, by showing for each bill what fraudulent activity Vivit had performed. The chart provides data on which to determine the amount of loss claimed, because it provides a basis from which to discount the value of legitimate services provided by Vivit from the fraudulent billing that he submitted. In addition, the court was provided with evidence about the amount Vivit charged for the performance of legitimate services.

Armed with an accurate cost of fraudulent services provided by Vivit and the ratio of fraudulent to legitimate services provided, as well as the rates that Vivit charged, we find that the district court made a reasonable approximation of the loss given the factual complexity of Vivit's scheme. Because the amount of loss need not be calculated with precision and because we believe that the loss chart and other facts in the record relied on by the district court to formulate a loss calculation support the amount of loss found by the district court, we find no clear error in the calculation of loss made by the district court.

Vivit also argues that the district court's calculation of loss must be overturned because it is based on testimony of witnesses who did not testify at trial or at sentencing. While we appreciate that the government bears the burden of proof in demonstrating the amount of loss, see United States v. Bahhur, 200 F.3d 917, 924 (6th Cir. 2000), the sentencing court is not bound by the Federal Rules of Evidence at sentencing and "may take any information into account in passing sentence so long as it has sufficient indicia of

reliability to support its probable accuracy."
United States v. Carmack, 100 F.3d 1271, 1276
(7th Cir. 1996). The information on which the
district court based its loss calculation had
been presented into evidence at trial without
objection before the court considered it, and
given the cumulative and reinforcing nature of
this evidence, we find no clear error in
determining that this evidence was supported by
sufficient indicia of reliability in support of
its accuracy, a finding that Vivit does not
dispute. Additional testimony at sentencing is
unnecessary to support a finding of reliability.
See United States v. Morrison, 207 F.3d 962, 968
(7th Cir. 2000). "A court can consider whatever
evidence is before it in arriving at the amount
of loss." United States v. Brown, 136 F.3d 1176,
1184 (7th Cir. 1998). Therefore, we find no clear
error in the district court's reliance on
evidence in the record that was not supported by
witness testimony in its calculation of loss
amount.

B.  Use of Minors

   Next, Vivit contends that the district court
committed error in increasing his total offense
level by two points for using minors in the
commission of his offenses, pursuant to U.S.S.G.
sec. 3B1.4. Vivit argues that the court committed
error in finding that minors had in fact
participated in Vivit's scheme. Vivit also argues
that because all the fraudulent mailings
involving minors were completed before the
enactment of sec. 3B1.4, enhancement under this
Guidelines section violates the Ex Post Facto
Clause of the Constitution. We review de novo the
district court's interpretation of sec. 3B1.4,
see United States v. Brack, 188 F.3d 748, 765
(7th Cir. 1999), and the question whether the Ex
Post Facto Clause was violated by the enhancement
pursuant to sec. 3B1.4.

1.  Ex Post Facto Clause

   Guidelines sec. 3B1.4, the "use of minors"
enhancement, was enacted with an effective date
November 1, 1995. U.S.S.G. sec. 3B1.4 historical
note. Vivit admits that he filed false records
for many minor patients, but he asserts that this
conduct all occurred before November 1, 1995, and
that application of the sec. 3B1.4 enhancement
violates the Ex Post Facto Clause of the United
States Constitution, U.S. Const. Art. I, sec. 9,
because that clause generally prohibits the
retroactive application of the Sentencing
Guidelines if it results in a more onerous
penalty. See United States v. Shorter, 54 F.3d
1248, 1261 (7th Cir. 1995).

The one-book rule, the policy statement guiding the use of multiple guidelines, found in Guidelines sec. 1B1.11(b)(1), provides that "[t]he court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." The one-book rule expresses the intent of the Sentencing Commission that the Guidelines reflect a cohesive whole and the Commission's resistance to application of various Guidelines in a piecemeal fashion. See United States v. Bousa, 997 F.2d 263, 266 (7th Cir. 1992). When faced with the possibility of an ex post facto violation, the court is normally directed to "use the Guidelines Manual in effect on the date that the offense of conviction was committed." U.S.S.G. sec. 1B1.11(b)(1).

However, the Guidelines also indicate that "[i]f the defendant is convicted of two offenses, the first committed before, and the second after, a revised edition of the Guidelines Manual became effective, the revised edition of the Guidelines Manual is to be applied to both offenses." U.S.S.G. sec. 1B1.11(b)(3). In this case, Vivit was convicted on count 17, the final count of his indictment for conduct that was committed in August 1996, well after November 1, 1995. Therefore, on its face, sec. 1B1.11(b)(3) should apply, and absent ex post facto concerns we would find no error in the application of sec. 3B1.4.

Vivit contests the application of sec. 1B1.11(b)(3) on two bases: (1) the only post-revision count, count 17, does not involve the use of a minor, so sec. 1B1.11(b)(3) is inapplicable; and (2) sec. 1B1.11(b)(3) violates the Ex Post Facto Clause. The former argument ignores the plain language of sec. 1B1.11(b)(3), which requires only that two crimes be committed on different dates, before and after the enactment of the Guidelines revision in question. The one-book rule does not require that both these crimes involve the same course of conduct, or that both involve conduct giving rise to the same sentencing enhancement. Therefore, it is immaterial whether the conduct predicate to Vivit's conviction on count 17 involved the use of a minor.

However, if we find application of sec. 1B1.11(b)(3) violates the Ex Post Facto Clause, sec. 1B1.11(b)(1) requires that we instead apply the 1994 Sentencing Guidelines to all Vivit's convictions, which would preclude a sec. 3B1.4 enhancement. See United States v. Ortland, 109 F.3d 539, 547 (9th Cir. 1997) (finding that mail fraud is not a continuing offense, so the defendant may properly be sentenced under multiple sets of guidelines); United States v. Bertoli, 40 F.3d 1384, 1404 (3d Cir. 1994). But see United States v. Kimler, 167 F.3d 889, 893

(5th Cir. 1999); United States v. Santopietro, 166 F.3d 88, 95-96 (2d Cir. 1999). The settled law of this circuit is that when a defendant commits crimes that straddle the date of promulgation of new guidelines provisions, the defendant can be punished under a guideline effective after the beginning of the straddle period. See, e.g., United States v. Boyd, 208 F.3d 638, 648 (7th Cir. 2000); United States v. Korando, 29 F.3d 1114, 1119-20 (7th Cir. 1994). The rationale for this rule is that "a statute increasing the penalty for [an offense] beginning before the date of enactment but continuing afterwards does not offend the Constitution." United States v. Baresh, 790 F.2d 392, 404 (5th Cir. 1986).

The government contends that because the district court found the conduct committed by Vivit similar enough for sec. 3D1.2(d) grouping to apply, Vivit's actions constituted a continuing offense which straddled the promulgation of sec. 3B1.4, quieting any potential ex post facto concerns about the use of the 1995 Guidelines. However, the government's position is controversial. In United States v. Ortland, 109 F.3d at 547, the Ninth Circuit found that because the predicate conduct constituting mail fraud was completed on mailing, a mail fraud scheme constituted a series of completed offenses, rather than a continuing course of conduct. On this basis, the court felt that applying the grouping rules and the one-book rule to a series of mail fraud crimes constituted a violation of the Ex Post Facto Clause on offenses completed before a revision of the Guidelines. See id.; see also Bertoli, 40 F.3d at 1404-07 (finding error in the district court's failure to analyze offenses independently for ex post facto problems). However, in United States v. Kimler, 167 F.3d at 895, the Fifth Circuit reached the opposite conclusion, relying on the Eleventh Circuit's reasoning in United States v. Bailey, 123 F.3d 1381, 1403-07 (11th Cir. 1997), that the adoption of the one-book rule and the grouping rules put criminals on notice that "the version of the sentencing guidelines in effect at the time he committed the last of a series of grouped offenses will apply to the entire group," Kimler, 167 F.3d at 895, to determine that there was no ex post facto violation in using a revised guideline to sentence grouped mail fraud convictions. In that case, the court noted that although mail fraud offenses were completed offenses, rather than continuing offenses like conspiracies, because the grouping rules were in effect at the time a defendant committed acts of mail fraud, "a defendant has notice that if he continues to commit offenses that are grouped together, the revised guidelines will apply to

the group." Id. at 894 n.6; see also Bailey, 123 F.3d at 1406-07; United States v. Cooper, 35 F.3d 1248, 1252 (8th Cir. 1994).

In this circuit, the question whether to apply sec. 1B1.11(b)(3) depends on whether we perceive a defendant's course of conduct to straddle the enactment of revisions to the Sentencing Guidelines. See Boyd, 208 F.3d at 648-49. With continuing offenses, such as conspiracies, we have never questioned the applicability of ex post facto principles to this practice, because by agreeing to engage in a conspiracy, a defendant becomes culpable for all subsequent acts committed by the conspiracy. See Korando, 29 F.3d at 1119. However, we have held that mail fraud is a completed offense, implying that "the crime of mail fraud is completed, for sentencing purposes, at the time of the mailing. The actual duration of the scheme is of no import." United States v. Barger, 178 F.3d 844, 847 (7th Cir. 1999). For this reason, we have determined that mail fraud is not a straddle offense, in which case sec. 1B1.11 (b)(3) might not apply. See id. at 848.

However, in Barger, we were not confronted with a situation in which mail fraud convictions were grouped together according to sec. 3D1.2, because the criminal conduct committed in that case occurred before the enactment of the Guidelines. According to the rationale of the Eleventh Circuit in Bailey, the enactment of the grouping Guidelines places criminals on notice that committing additional criminal acts that are subject to grouping after a revision of the Guidelines makes all the defendant's conduct susceptible to the one-book rule. Bailey, 143 F.3d at 1406-07. On this basis, a series of mail fraud convictions that are grouped may be considered to straddle a revision without a presumptive ex post facto violation because of the criminal's prior notice of the grouping rules. Because the grouping rules were not available to provide notice when the defendants in Barger committed the predicate offenses that formed the basis for their convictions, we find that the result in Barger, that a series of mail fraud offenses do not straddle the enactment of the Guidelines, does not require us to conclude that applying a revised Guidelines Manual to a series of grouped mail fraud convictions constitutes an ex post facto violation.

By banning ex post facto application of new criminal laws, "the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." Weaver v. Graham, 450 U.S. 24, 28-29 (1981); see also

Miller v. Florida, 482 U.S. 423, 430 (1987); Dobbert v. Florida, 432 U.S. 282, 293 (1977). The clause was also intended to check governmental power "by restraining arbitrary and potentially vindictive legislation." Weaver, 450 U.S. at 29. "Critical to relief under the Ex Post Facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated." Id. at 30.

Viewed in this context, the relevant inquiry becomes whether the grouping rules give the defendant fair notice at the time a crime is consummated that the commission of further crimes subject to grouping would subject the defendant to sentencing under revised Guidelines. The grouping rules, enacted in 1987, provide warning to criminals that completing another criminal offense similar to one committed previously places them in peril of sentencing under a revised version of the Guidelines. The introductory commentary to the grouping rules explains that because the offense guideline for fraud, sec. 2F1.1, "deal[s] with repetitive or ongoing behavior," multiple fraud convictions are appropriately grouped when the convictions involve substantially the same harm. See U.S.S.G. sec. 3D introductory commentary. We believe that this conclusion reflects the intent of the Sentencing Commission to provide notice to criminals that engaging in ongoing fraudulent behavior involving the same type of harm risks grouping of convictions, which because of the one-book rule, will all be sentenced according to the Guidelines in effect when the latest conduct occurred.

For this reason, we believe that the enactment of the grouping rules provides fair notice such that the application of sec.sec. 1B1.11(b)(3) and 3D1.2 does not violate the Ex Post Facto Clause. To violate the Ex Post Facto Clause, the application of amended Guidelines must disadvantage the defendant without providing the defendant with prior notice. See Miller, 482 U.S. at 430. Because the grouping rules provide such prior notice, we favor the position advanced by the Eighth Circuit in Cooper that "it was not the amendments to the Sentencing Guidelines that disadvantaged [the defendant], it was his election to continue his criminal activity." 35 F.3d at 1250.

Vivit does not argue that his conduct did not involve "substantially the same harm," in which case the grouping rules should not have been applied. Nor does he provide any other reason that the enactment of the grouping rules should

not be construed to place him on notice that the commission of further fraudulent mailings would subject him to sentencing under amended Guidelines. For this reason, we find no Ex Post Facto Clause violation in the district court's determination to apply the "use of minors" enhancement to all of the grouped offenses committed by Vivit.

2.  Findings of Fact

Vivit also argues that the district court committed clear error in finding that minors participated in his scheme. Vivit was convicted on two counts in which the predicate conduct involved false insurance claims filed on behalf of a minor, and Vivit admits that he treated many minors in the course of his operation of the clinic. However, he contends that the role of the minor patients in his scheme was too minimal or unintentional for the finding that he used minors to commit the fraud offenses.

Application note 1 to sec. 3B1.4 includes within the definition of use "directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." In United States v. Benjamin, 116 F.3d 1204, 1206 (7th Cir. 1997), we initially reviewed the "use" requirement of sec. 3B1.4 and found it met when the defendant took some affirmative action to involve a minor. See also United States v. Butler, 207 F.3d 839, 848 (6th Cir. 2000) ("[B]y deeming age relevant, Congress likely imagined an offender who actually exercised some control or took some affirmative role in involving the minor."). In United States v. Brack, 188 F.3d at 765, we found that the fact bases for an enhancement under sec. 3B1.4 had been met when the defendant performed affirmative acts to involve a minor in her crimes. Therefore, Vivit "used minors in the commission of his crimes" if his affirmative actions involved minors in his criminal activities.

Vivit treated Jennifer Cailles for injuries suffered in an automobile accident. At that time, she was sixteen years old. As a part of the treatment, Vivit directed Cailles to sign the attendance sheet fraudulently to inflate the number of visits she paid Vivit. Vivit eventually submitted a bill to Cailles's insurer that showed forty-nine visits made, when Cailles actually made only eight or ten visits. Vivit also treated nine-year-old Laquita Barnett and her seven-year-old sister Johnetta Johnson for injuries suffered in an automobile accident. Laquita visited Vivit twice, and was given hot pad therapy. However, Vivit submitted a bill claiming that she had been given a comprehensive examination and had made

two follow-up visits and twelve visits for therapy. Johnetta only visited Vivit once, but Vivit filed a bill with her insurer indicating twelve visits had occurred. Vivit directed both these girls to falsify an attendance sheet eleven times.

The facts presented about Jennifer Cailles, Laquita Barnett and Johnetta Johnson support the district court's finding that Vivit directed these minors to create a false attendance record. Therefore, Vivit's direction to falsify attendance records involved these minors in his crime and fell within the definition of "use" of minors contemplated by sec. 3B1.4.

C.  Risk of Serious Bodily Injury

Vivit also challenges the district court's determination that the medical treatment Vivit provided, or failed to provide, placed some of his patients at risk of serious bodily injury, on which basis the court increased Vivit's total offense level two levels, according to U.S.S.G. sec. 2F1.1(b)(6)(A). Vivit claims that this finding of fact was clearly erroneous because it was based on speculation as to potential injury. The determination that Vivit's conduct posed a conscious or reckless risk of serious bodily injury to his patients is a finding of fact, and we review for clear error. See United States v. Turner, 102 F.3d 1350, 1357 (4th Cir. 1996). However, to the extent that we review whether a sentencing enhancement is appropriate under this type of offense conduct, we face a question of law that we review de novo. See id.

Guidelines sec. 2F1.1(b)(6) directs courts to enhance a defendant's total offense level by two levels if the fraud perpetrated by the defendant involves "the conscious or reckless risk of serious bodily injury." U.S.S.G. sec. 2F1.1(b)(6)(A). "Serious bodily injury" is a phrase of general applicability used frequently throughout the Guidelines, and the phrase has been explained to mean "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. sec. 1B1.1 application note 1(j). Guidelines sec. 2F1.1 does not provide any insight into the type of conduct that should be considered reckless, but application note 1 to sec. 2A1.4 describes recklessness as "a situation in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise

in such a situation." U.S.S.G. sec. 2A1.4 application note 1 (involuntary manslaughter).

On appeal, Vivit contends that because no patient was injured, any risk of serious injury was purely conjectural, and for this reason, the district court lacked any evidentiary basis on which to base its enhancement. See United States v. Greene, 71 F.3d 232, 236 (6th Cir. 1995) (requiring district courts to base reckless risk enhancement on evidence of risk). Improper medical procedures, such as unnecessary surgery, performed for fraudulent purposes obviously may pose a risk of serious bodily injury. See, e.g., United States v. Laughlin, 26 F.3d 1523, 1531 (10th Cir. 1994) (finding that unnecessary surgery creates a risk of serious bodily injury). However, as the Eighth Circuit noted in United States v. McCord, Inc., "for most frauds, risk of serious bodily injury is less direct and less obvious." McCord, 143 F.3d at 1098. In cases of fraud, where sec. 2F1.1(6)(A) applies, we are not concerned with whether actual injury occurred, but whether the defendant's fraudulent course of conduct created a risk that others would suffer serious bodily injury. In addition, Guidelines sec. 2F1.1(6)(A) demands that such a risk be undertaken recklessly. See id. Whether improper medical treatment may form the basis for an enhancement under sec. 2F1.1 (6)(A) is a question of first impression for this circuit.

The government provided three bases on which Vivit's sentence might have been enhanced: (1) his failure to supervise an unlicensed individual performing potentially dangerous physical therapy; (2) his direction to apply heat therapy to bruised areas, increasing the risk of injury; (3) his failure to examine physically certain patients he knew to have been injured in automobile accidents. The district court enhanced Vivit's sentence for reckless risk of serious bodily injury, but the court did not state directly on which of these theories it based the enhancement. The court did note its dissatisfaction with Vivit's diagnostic techniques by saying, "what [Vivit]'s position in this court is 'you know, I really didn't do very much. I used the most conservative treatment.' . . . But the fact of the matter is that the most conservative treatment is not always best. . . . [H]e was, given his medical examination practices, a very lucky man that he did not miss something more serious, and for all we know maybe he did."

Vivit contends that the government failed to prove either that Vivit ignored a known risk of serious injury or that any of the treatments that he employed could have caused serious bodily

injury. The rehabilitative techniques employed by Vivit, which included ultrasound therapy, electric muscle stimulation and using heat pads, are much less intrusive or inherently dangerous than surgical procedures. The experts provided by the government at trial testified that it was possible to cause injury using electric muscle stimulation if the electrodes used in the therapy are improperly applied or placed close to the heart. These experts also indicated that providing heat or ultrasound therapy to bruised areas was contraindicated. In addition, these experts also testified that these therapies provided no health benefits.

None of the government's twenty-six patient witnesses testified that electrical muscle stimulation was used in the chest area, and given the purpose of this therapy, we find the risk of injury from that type of treatment to be slight, even if the therapist who performed the therapy lacked a license. In addition, although applying heat to bruised areas may increase the internal bleeding from this bruising, this type of treatment does not rise to the level of "extreme physical pain or protracted function" required by the serious bodily injury standard. In fact, the risk of increased injury created by the treatments that Vivit actually performed or ordered performed seems quite slight, certainly too slight to justify an enhancement for reckless risk of serious bodily injury.

The medical procedures that Vivit failed to perform raise more troubling questions. To conceal his ongoing fraud from insurers, Vivit engaged in rudimentary examination procedures better designed to generate additional visits in his attendance log than to diagnose injury. On multiple occasions, Vivit failed to perform physical examinations on patients who visited him following automobile accidents. In addition, Vivit failed to perform certain basic diagnostic tests, such as taking blood pressure, on certain patients such as Avelina De La Rosa who later proved to be at risk. While we do not believe that Vivit created a risk by failing to treat patients such as the Sansanos who visited him to inflate their own insurance settlements knowing that he would not provide adequate care, patients such as De La Rosa relied on Vivit's medical opinion and treatment to ensure that they had not suffered serious injury. By failing to examine such patients properly, Vivit created a risk that, had these patients suffered serious injuries, their injuries would remain untreated. Moreover, by presenting evidence that certain of his patients were at risk of serious bodily injury without treatment, for example by virtue of their high blood pressure, the government has

presented sufficient evidence to show that the risk here was actual, not conjectural. The facts also clearly demonstrate that Vivit acted recklessly in ignoring the risk that his failure to treat created. Therefore, we conclude that the district court did not err in enhancing Vivit's sentence under sec. 2F1.1(6)(A) for reckless risk of serious bodily injury.

D.  Leadership Role

Vivit contends that the district court erred in increasing his total offense level four points based on his leadership role in the scheme. He argues that the record does not support such a finding of fact, and the court failed to make express findings as to which of his patients constituted members of the scheme for purposes of establishing a leadership role under U.S.S.G. sec. 3B1.1(a). The court's determination that Vivit played a leadership role in the scheme is a finding of fact, and we review for clear error. See United States v. Lewis, 79 F.3d 688, 690 (7th Cir. 1996).

Guidelines sec. 3B1.1 directs the sentencing court to enhance a defendant's offense level four levels "[i]f the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. sec. 3B1.1(a). A "participant" is "a person who is criminally responsible for the commission of the offense." U.S.S.G. sec. 3B1.1 application note 1. To determine whether a defendant is an organizer or leader, we consider "the defendant's exercise of decision-making authority, the nature of his participation in committing the crime, his recruitment of accomplices, his claimed right to a larger share of the criminal proceeds, the extent of his participation in planning or organizing the crime, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." United States v. Sierra, 188 F.3d 798, 803-04 (7th Cir. 1999); see also U.S.S.G. sec. 3B1.1 application note 4. These factors are not exhaustive, nor must all be present in order to enhance the defendant's sentence. See United States v. Mankiewicz, 122 F.3d 399, 406 (7th Cir. 1997). Instead, we weigh these factors "in light of the Guidelines' intent to punish with greater severity leaders and organizers of criminal activity." Sierra, 188 F.3d at 804.

The district court adopted the statements in the PSR that Vivit's scheme involved at least five other participants: Estrella Del Moral, his receptionist; the Sansano family, Roy, Myla and Lauro; and Veronica Leighton. Even though four of these named participants were Vivit's patients,

the district court felt that the four-level enhancement was especially appropriate because Vivit "in a moral sense and maybe in a legal sense, made criminals out of some of his patients." Vivit instructed Del Moral to create false records and order patients to file false claims and allowed her to perform therapy without a license, which he billed to insurers. Vivit taught Leighton how to obtain disability payments fraudulently and convinced her to create false records inflating her insurance claim. Vivit also instructed each of the Sansanos to create false medical records to inflate their insurance claims.

The argument that the sentencing court failed to identify five participants on which to base the enhancement lacks merit. In this case, the district court adopted the findings of fact in the PSR, which isolated five individuals who were deemed to be participants, and a sentencing court may adopt the conclusions in the PSR as its own. See United States v. Spears, 965 F.2d 262, 273 (7th Cir. 1992); United States v. Musa, 946 F.2d 1297, 1308 (7th Cir. 1991). By adopting the conclusions of the PSR, the sentencing court adopted by reference the individuals isolated therein as participants.

Vivit's argument that those patients of his who were deemed participants lacked criminal intent proves equally unavailing. To count as a "participant" in Vivit's scheme, his patients must have been criminally responsible. See U.S.S.G. sec. 3B1.1 application note 1. This responsibility requires criminal intent, which belies these patients' status as victims. To this extent, Vivit raises a valid objection; none of those patients who were victimized by Vivit's poor treatment necessarily shared Vivit's criminal intent to defraud their insurers. However, Vivit treated more than 130 patients, and although many of these patients may have been innocent victims, some of these patients performed acts that suggest criminal responsibility.

Vivit does not contest that Del Moral and Leighton were participants in his scheme. Instead, he focuses on the criminal responsibility of the Sansanos. Vivit presented each of the Sansanos with an attendance sheet and asked them to sign and date it, which they each did twenty-seven times. Vivit contends that this procedure was done to set up future appointments, and the Sansanos testified that they "pretty much followed instructions," in signing the sheets. However, the Sansanos back-dated many of these "appointments" to cover up the lapse of time between their automobile accident and their first

consultation with Vivit. Roy Sansano also testified that his family visited Vivit because a friend told him that Vivit would create a large medical bill for him and his family to be used in their insurance claim.

In reference to their claim, the Sansanos signed false documents misrepresenting the extent of treatment that they received from Vivit. The facts presented at Vivit's trial suggest that the Sansanos filed these documents intending to defraud their insurer. They also demonstrate that Vivit directed them on how to create a false record of treatment, and this false record of treatment constituted the basis on which the Sansanos filed false insurance claims. Therefore, the Sansanos were all participants in Vivit's scheme within the meaning of sec. 3B1.1. Considering Vivit's activities within the rubric of sec. 3B1.1, the evidence presented at trial demonstrates that he was the principal organizer of numerous fraudulent insurance claims, that he recruited patients to file these false claims and that the primary financial benefit from these activities accrued to him. For this reason, we find no error in the sentencing court's enhancement of Vivit's total offense level as a leader and organizer.

E.  Position of Trust

Finally, Vivit claims error in the district court's determination that Vivit abused his position of trust relative to the insurance companies he defrauded, on which basis the court increased his total offense level an additional two levels according to U.S.S.G. sec. 3B1.3. Vivit argues that he did not occupy a position of trust in relation to the insurance companies that he defrauded, and he contends that this enhancement actually constitutes impermissible double counting. Interpretation of the term "position of trust" is a legal question that we review de novo. See United States v. Hathcoat, 30 F.3d 913, 919 (7th Cir. 1994). However, the determination that Vivit occupied a position of trust is a finding of fact, which we review only for clear error. See United States v. Boyle, 10 F.3d 485, 489 (7th Cir. 1993). The determination whether a court has engaged in impermissible double counting is a question of law, which we review de novo. See United States v. Compton, 82 F.3d 179, 183 (7th Cir. 1996) (citation omitted).

Guidelines sec. 3B1.3 requires courts to increase the total offense level of a defendant by two levels "[i]f the defendant abused a position of public or private trust . . . in a

manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. sec. 3B1.3. The district court felt that the insurance companies to whom Vivit submitted claims trusted the doctor, and increased accordingly on this ground. However, Vivit claims that because his relationship with these insurance companies was commercial rather than fiduciary, the enhancement is not applicable.

We recently disposed of this argument in United States v. Hoogenboom, 209 F.3d 665, 671 (7th Cir. 2000), when we noted that "[m]edical service providers occupy positions of trust with respect to private or public insurers (such as Medicare) within the meaning of guideline sec. 3B1.3." Id. (citations omitted). We explained that "[m]edical providers . . . enjoy significant discretion and consequently a lack of supervision in determining the type and quality of services that are necessary and appropriate for their patients. This forces [the insurer] to depend, to a significant extent, on a presumption of honesty when dealing with statements received from medical professionals." Id. Although in Hoogenboom, we were faced with fraud committed against a public insurer, Medicare, rather than against private insurers, we made no distinction between the two in determining whether the enhancement was applicable, and we believe that no distinction exists. For this reason, the facts presented by Vivit cannot be distinguished from those presented in Hoogenboom, and we find the logic in that case controlling.

Vivit also claims that enhancement under sec. 3B1.3 constitutes impermissible double counting, because it punished him for both acting as a leader and abusing a "special skill." Guidelines sec. 3B1.3 prohibits the enhancement under sec. 3B1.3 for use of a "special skill" in addition to enhancement under sec. 3B1.1 for a leadership role in the offense, but permits the enhancement for an "abuse of trust" in addition to a sec. 3B1.1 enhancement. U.S.S.G. sec. 3B1.3. The district court enhanced Vivit's sentence under both sec.sec. 3B1.1 and 3B1.3, but the court's articulated basis for the sec. 3B1.3 enhancement was that "it is fair to say that he counted upon that the insurance companies would extend trust to him, and certainly after a period of time doing this it is quite clear that he understood that they did trust him; so that he did abuse his trust relative to the insurance companies." Therefore, the court based its enhancement on "abuse of trust," not on "use of a special skill." There is no impermissible double counting to enhance under both sec.sec. 3B1.1 and 3B1.3 in these circumstances.

III.  Conclusion

For all the foregoing reasons, we find no error in the district court's computation of Vivit's sentence. Therefore, the decision of the district court is Affirmed.

Easterbrook, Circuit Judge, concurring. I join the court's opinion but add one thought. The gymnastics performed in Part II.B.1 to show that a two-level increase in Vivit's offense level is compatible with the ex post facto clause are unnecessary, because the sentencing guidelines are not "laws" within the scope of that clause. See United States v. Seacott, 15 F.3d 1380, 1391–93 (7th Cir. 1994) (concurring opinion); cf. Prater v. U.S. Parole Commission, 802 F.2d 948, 951-52 (7th Cir. 1986) (en banc) (parole release guidelines are not "laws" for ex post facto purposes). Many cases say, and a few hold, that changes in the guidelines must be treated like changes in statutory punishments for purposes of the ex post facto clause, and the parties to this case accept that view, but these decisions are unconvincing. The only "law" at issue is the Sentencing Reform Act of 1984, enacted long before Vivit's crimes. Nothing that has occurred since Vivit committed his acts changed the definition of the offense, its maximum punishment, or the evidence that may be used to support conviction. See Carmell v. Texas, 68 U.S.L.W. 4325, 4328-29 (U.S. May 1, 2000). When open-ended discretion prevailed before the guidelines, no one would have doubted that Presidents could appoint hard-nosed judges who handed out steep penalties, provided they did not exceed the statutory maximum at the time of the defendant's deeds. Large swings in effective punishment occurred because of changes in the composition of the bench and prevailing views about the seriousness of particular offenses.

What judges used to do without offending the ex post facto clause, the Sentencing Commission may do. The Sentencing Reform Act moves discretion from the individual judge to the Commission. Because the ex post facto clause does not apply to the judicial branch, see Marks v. United States, 430 U.S. 188, 191 (1977), and the Commission is in the judicial branch, see Mistretta v. United States, 488 U.S. 361, 384-97 (1989), the effective constraint is the due process clause, which requires judges to refrain from adopting startling interpretations of existing rules. E.g., Bouie v. Columbia, 378 U.S. 347 (1964); Prater, 802 F.2d at 952. Vivit does not contend that the increase in his sentence is

so surprising that it violates the due process clause, and given the history of variability in sentencing practices over time (and across judges) such an argument would be untenable. "Changing the guidelines after the commission of a crime does not deprive the criminal of notice of the elements of the offense or the statutory limits of punishment. It may upset the expectations of the few would-be wrongdoers who study sentencing practices to determine their risks--though even a small change in the probability of arrest or prosecution will have a much greater effect on the anticipated punishment than does a change in the guidelines, and no one believes that pouring extra resources into the detection and prosecution of crime violates the ex post facto or due process clause." Seacott, 15 F.3d at 1392-93. So although my colleagues faithfully implement the complex rules that have sprouted up to limit the damage caused by applying the ex post facto clause to a subject outside its proper domain, I would prefer a shorter path to affirmance. Congress has told courts to use the guidelines in force at the time of sentencing. 18 U.S.C. sec.3553(a)(4). That command is constitutional, and I would follow it notwithstanding the United States Attorney's failure to defend (or even cite) the governing statute.