**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Aurelio P. JIMENEZ, Defendant–Appellant.**

Nos. 01–2896, 01–2897.

United States Court of Appeals, Seventh Circuit.

Argued June 11, 2002.

Decided July 1, 2002.

Before COFFEY, RIPPLE and KANNE, Circuit Judges.

### ORDER

Podiatrist Aurelio P. Jimenez bilked several government health benefit programs out of millions of dollars by writing phony prescriptions and submitting fraudulent bills. After he pleaded guilty to six counts of mail fraud, *see* 18 U.S.C. § 1341, and one count of criminal contempt, *see id.* § 401, the district court sentenced him to a total of 68 months' incarceration and ordered him to pay $2,760,000 in restitution. On appeal Jimenez argues that the court

wrongly "forced" him to testify at the sentencing hearing and erred by concluding that he subjected his patients to a risk of serious bodily injury. We affirm the sentences imposed by the district court.

Jimenez is a 43–year–old podiatrist from Kokomo, Indiana. In March 2000 a federal grand jury returned an indictment charging him with 26 counts of mail fraud. The indictment alleged that Jimenez provided unnecessary treatment to patients and prescribed them medication that they didn't need. He also submitted fraudulent bills to Medicare and Medicaid. A second indictment in January 2001 charged Jimenez with two counts of criminal contempt for fraudulently obtaining a mortgage loan while on pretrial release.

Jimenez and the government entered into a plea agreement in which he admitted guilt on six counts of mail fraud and one count of criminal contempt. He also agreed to forfeit property. Although the plea agreement reflected the parties' agreement regarding several aspects of his potential sentences, the parties disagreed whether Jimenez's conduct created a risk of serious bodily injury deserving of a two-level upward adjustment under U.S.S.G. § 2F1.1(b)(7)(A). The parties agreed to present evidence to the district court regarding this issue.

After the district court accepted his guilty pleas, the probation office prepared and submitted a presentence investigation report recommending the two-level upward adjustment. Both Jimenez and the government filed sentencing memoranda in response to the PSR. But while the government submitted evidentiary exhibits in support of its positions, Jimenez attached only letters from family and friends, and an unsworn statement denying generally the points raised in the government's sentencing memorandum. For example, regarding the "risk of serious bodily injury" adjustment, his supporting statement remarked that "Dr. Jimenez disputes the claim that a 'great portion' of his clients received weekly prescriptions for pain killers."

At the beginning of the sentencing hearing the district court noted that Jimenez's sentencing memorandum and supporting statement was uninformative and unpersuasive because they consisted merely of unsworn, general denials of the points raised in the government's submission. Defense counsel then told the court that Jimenez was planning to read his statement under oath. The court, however, warned defense counsel that the doctor's statement was unhelpful in resolving the specific factual disputes raised by the government's submission. Defense counsel responded that Jimenez would testify to counteract the government's evidence.

The government then called Dr. Mark Schlichter to testify as a podiatric expert. Dr. Schlichter, who had examined 200 random patient files from 1992 through 1997, testified that Jimenez routinely wrote repetitive prescriptions for highly addictive pain medications, often giving patients refills once or twice a week. As a result many patients visited Jimenez solely to obtain drugs, exposing them to addiction that could lead to liver, kidney, and other systemic problems. Dr. Schlichter also noted that Jimenez frequently diagnosed patients with anxiety and prescribed anti-anxiety medication, treatment outside the scope of a podiatric practice. In addition Jimenez diagnosed fractures where none existed, and then placed patients in unnecessary casts, straps, and mobilization boots. According to Dr. Schlichter, restricted mobility could exacerbate circulatory conditions in elderly patients.

After the government finished presenting witnesses, defense counsel re-called

Dr. Schlichter for a brief examination. After questioning the expert, defense counsel informed the district court that she had no further witnesses to call. The court then prodded defense counsel to present evidence:

> THE COURT: How did you intend to put before me the evidence in the unsworn-to submission?
>
> DEFENSE COUNSEL: We don't.
>
> THE COURT: You withdraw it?
>
> DEFENSE COUNSEL: Well, we— We don't withdraw it because it's part of our response to the—
>
> THE COURT: I can't—
>
> DEFENSE COUNSEL: But it's not—
>
> THE COURT: I can't consider it as evidence unless it's under oath.
>
> DEFENSE COUNSEL: I under ... (Pause in proceedings)
>
> DEFENSE COUNSEL: Then I will call Dr. Jimenez, Your Honor.
>
> THE COURT: All right.
>
> DEFENSE COUNSEL: If the Court— The Court's position is that unless he acknowledges it under oath, that it cannot be considered as a part of our response?
>
> What I don't want to do here, Your Honor, is to try this case.
>
> THE COURT: Well, I can't help you with your strategies, but I can tell you that evidence that's not sworn to will not be considered.
>
> DEFENSE COUNSEL: Okay.
>
> THE COURT:— before the Court— or by the Court on any evidentiary matter.
>
> DEFENSE COUNSEL: Then I will call Dr. Jimenez.

(Sentencing Hearing, pp. 100–01.) Jimenez subsequently testified. The court ultimately imposed the two-level upward adjustment under § 2F.1(b)(7)(A), placing his total offense level at 25, which, coupled with his criminal history calculation of I, yielded a sentencing range of 57 to 71 months. The court sentenced Jimenez to six concurrent terms of incarceration of 60 months on the mail fraud counts, and a consecutive term of 8 months' incarceration on the contempt charge. The court also sentenced him to four years' supervised release, 400 hours' community service, imposed $700 in special assessments, and ordered him to pay restitution. The court entered separate judgments and Jimenez appeals both.

Jimenez makes two arguments on appeal. First he contends that the district court erred by "requiring" him to testify at the sentencing hearing. He also argues that the court applied the wrong legal standard in determining that his conduct involved a risk of serious bodily injury.

Jimenez's challenge to the district court's handling of the sentencing hearing cannot prevail. He argues that the court erred by requiring him to testify as a precondition to considering his factual objections to the PSR, and that he suffered prejudice because the court relied on his demeanor and attitude in sentencing him near the top of the guideline range (he received 68 months out of a range of 57 to 71 months). Judge Barker may have misspoke by telling defense counsel that she could *not consider as evidence* Jimenez's unverified statement (he was free to rely on the unsworn statement despite its dubious value), but her comment was harmless. Jimenez was free to present any evidence he wanted (or none at all) to convince the court that the contested sentencing issues should be resolved in his favor. Judge Barker, however, properly advised defense counsel that what he had submitted so far was unpersuasive. This advice was sound, both factually (what good is an unsworn

statement from an admitted swindler?); and legally—we have repeatedly emphasized that unverified declarations from the defendant are not evidence that can refute a PSR. *See, e.g., United States v. Krankel,* 164 F.3d 1046, 1055 (7th Cir.1998); *see also United States v. Coonce,* 961 F.2d 1268, 1280 (7th Cir.1992) (defendant carries the burden of presenting some evidence beyond a mere denial calling the reliability or correctness of the alleged facts into question); *United States v. Taylor,* 72 F.3d 533, 547 (7th Cir.1995) (same); *United States v. Mustread,* 42 F.3d 1097, 1101 (7th Cir.1994) (same).

█ Jimenez next argues that the district court used the wrong legal standard in increasing his offense level under § 2F1.1(b)(7)(A) (formerly § 2F1.1(b)(6)(A)). We review the district court's interpretation of the sentencing guideline de novo, *see United States v. Parolin,* 239 F.3d 922, 928 (7th Cir.2001), but its determination that his conduct posed a conscious or reckless risk of serious bodily injury to his patients is a finding of fact that we review for clear error, *see United States v. Vivit,* 214 F.3d 908, 920 (7th Cir.2000), *cert. denied,* 531 U.S. 961, 121 S.Ct. 388, 148 L.Ed.2d 299 (2000). Section 2F1.1(b)(7)(A) calls for a two-level upward adjustment if the defendant's fraud involves the conscious or reckless risk of serious bodily injury. "Serious bodily injury" means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1 comment. (n.1(j)). Though § 2F1.1 provides no insight into the term "reckless," another provision (pertaining to involuntary manslaughter) does—recklessness is a situation "in which the defendant was aware of the risk created by his conduct and the risk was of such a nature and degree that to disregard that risk constituted a gross deviation from the standard of care that a reasonable person would exercise in such a situation." U.S.S.G. § 2A1.4 comment. (n.1); *Vivit,* 214 F.3d at 921. Actual injury need not occur under § 2F1.1(b)(7)(A); a reckless or conscious undertaking of a risk is enough to trigger the adjustment. *Vivit,* 214 F.3d at 921; *see also United States v. W. Coast Aluminum Heat Treating Co.,* 265 F.3d 986, 993 (9th Cir.2001). Improper medical procedures performed for fraudulent purposes may pose a risk of serious bodily injury. *Vivit,* 214 F.3d at 921. The court applied these standards and concluded that his conduct did create such a risk in two respects—by exposing patients to addiction and to circulatory problems.

The district court did not misinterpret the guideline and did not clearly err by imposing the two-level upward adjustment. Jimenez's argument that the court significantly expanded the definition of serious bodily injury is simply untrue. Dr. Schlichter testified that Jimenez's excessive and unnecessary prescriptions for highly addictive pain medications placed his patients at risk of liver, kidney, and other systemic problems. The court then applied the correct legal standard:

But what we know from the evidence is that there's a pattern of drug prescriptions that do not conform to the standards of care and, further, that the care that was being given by Dr. Jimenez for various treatments is not consistent with the standard of care in podiatry.

And we have little warnings that were being provided to Dr. Jimenez and to investigators, it turns out, after the fact in terms of pharmacists' callbacks to say there's something improper about this

or something questionable, something amiss, that should have given Dr. Jimenez warning and, nonetheless, he proceeded.

Now, that's recklessness. And he, in doing that, created a reckless risk of serious bodily injury because we know that inappropriately prescribed drugs create the possibility of all kinds of anatomical reactions and injury.

And, in fact, some of the podiatric treatments to a vulnerable population, such as Medicare and Medicaid recipients, some of them at least, might be, as testified to by Dr. Schlichter, that when a patient is immobilized or his feet or ankles or something are immobilized, it may result in circulatory problems and so forth. That's a reckless risk.

And by pursuing his pattern of excessive treatments and uncalled-for proce-dures, he placed his patients at risk of serious bodily injury.

(Sentencing hearing, pp. 136–37.) Moreover, the court did not clearly err by concluding that Jimenez recklessly created a serious risk of bodily injury. The threat of liver, kidney, and other systemic problems meets the standard identified in Application Note 1(j) to § 1B1.1 in two respects— as a protracted impairment of a bodily organ function; or as a malady requiring medical intervention such as hospitalization or physical rehabilitation.

AFFIRMED.