# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

Nos. 02-3191 & 02-3263

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

RANDALL A. RETTENBERGER and
JULIE L. RETTENBERGER,

Defendants-Appellants.

_____

Appeals from the United States District Court for the
Northern District of Illinois, Western Division.
No. 01 CR 50016—**Philip G. Reinhard**, Judge.

_____

ARGUED SEPTEMBER 11, 2003—DECIDED SEPTEMBER 25, 2003

_____

Before FLAUM, Chief Judge, and POSNER and
EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge. A jury concluded that
Randall Rettenberger and his wife Julie were partners in
a scheme to defraud insurers, plus the Social Security
Administration, by pretending that Randall was disabled.
The payments that rolled in were sizable, as Randall had
taken out more than a dozen policies and had enjoyed a
substantial legitimate income before the supposed onset of
disability. Julie filled out most of the forms submitted to

insurers and the federal government for use in assessing Randall's claim, and she related that Randall had been turned into a couch potato who could do nothing but sit, smoke cigarettes, and watch television—while she knew that Randall was well enough to act as the developer of a residential subdivision, take an 8-day motorcycle trip in Mexico, go on whitewater rafting expeditions (one of which lasted 18 days), and use weapons (Randall hunted and shot a 7-point buck). Randall also went skiing in Aspen and drove the family car on trips to Acapulco, Arizona, and Nevada. Both Rettenbergers were sentenced to 57 months' imprisonment for mail fraud, defrauding the federal government, and 45 other counts.

The evidence permitted rational jurors to find guilt beyond a reasonable doubt. Although defendants contend that Randall had "good days" when he could function well, they do not establish how he could be unable to work yet perform real estate development activities, spend weeks on the Colorado and Salmon Rivers, barrel down mountains on skis, and drive cars and motorcycles for extended stretches, without encountering bad days or bad hours, nor does it explain why these activities were not reported to the insurers or the physicians who had diagnosed him as disabled.

Julie told insurers that Randall suffered from a mental disability caused by a fall in January 1995. (Whether the fall was genuine or staged is disputed.) When state troopers and an ambulance arrived, the Rettenbergers refused to allow Randall to be examined and drove off; he did not seek immediate medical attention. But in March 1995 Julie submitted claims under 14 policies of disability insurance and started the process of obtaining Social Security disability benefits. The forms described the disabling condition as "head trauma," "slow thought limits work functions," and the like. Randall's physician, Dr. Basile Lambos, signed forms certifying him as disabled because of "inability to concentrate" even though none of Lambos's tests (such as

a MRI scan) had shown any abnormality. Some insurers wanted more, and to satisfy them Julie submitted the diagnosis of Dr. James Kelly, a neurologist affiliated with Northwestern University. Kelly diagnosed Randall as suffering from "post-concussion syndrome" that impaired his ability to think, remember, concentrate, and speak. Kelly's diagnosis was influenced by the history that Julie Rettenberger submitted and by Randall's hesitant, slurred, and sometimes incoherent speech when he appeared in person (symptoms that, a jury sensibly could conclude, Randall had affected). Randall also submitted a report by Dr. Gerald Hoffman, a psychiatrist, who concluded that Randall's consciousness is too clouded to permit effective functioning. Hoffman's diagnosis was based on Randall's failure to respond to many of his questions (and his weird responses to others), and by Julie's report that Randall did nothing all day except smoke and watch TV. Once again, the jury could conclude that the diagnosis was based on fraudulent reports and thespian performances: garbage in, garbage out.

Most insurers, and the Social Security Administration, accepted these diagnoses and started paying benefits. But one insurer smelled a rat and hired a private investigator, who found Randall out and about (not only driving, rafting, shooting, and skiing, but also participating, without any apparent impairment, in a hearing about zoning changes for his subdivision). This insurer also sent Randall to Dr. Jesse Viner, a psychiatrist. (Till then, Randall and Julie had selected all the physicians; jurors sensibly could have concluded that they refused the paramedics' offer of assistance in January 1995 because they could not have determined which physicians would examine Randall.) Randall's behavior during the interview with Viner was so odd that he required Randall to take the Minnesota Multiphasic Personality Indicator to get a better handle on his mental state. Dr. Alex Caldwell evaluated Randall's responses

to the MMPI as atypical, likely the result of either "acute panic" or deceit. For example, Randall reported suffering delusions, which are not effects of concussions, more often than *bona fide* paranoid schizophrenics do. Caldwell told Viner that Randall's pattern of responses prevented use of the MMPI to ascertain his true mental status, but that the results were consistent with malingering. Viner interviewed Randall again and detected suspicious patterns in his verbal errors and hesitations. From there everything unraveled.

Defendants' lead argument on appeal is that the district judge hobbled their ability to obtain exculpatory evidence from Dr. Kelly when the judge prevented Kelly from telling the jury why he did not agree with Dr. Viner, Dr. Caldwell, and Dr. Jeri Morris (a neuropsychologist who followed up on Viner's findings and conducted an independent analysis) that Randall is faking his symptoms. The judge blocked this testimony because defense counsel had not disclosed before trial that they would ask Kelly about his evaluation of other physicians' assessments—though they did disclose that Kelly would explain and support his own diagnosis. The rule in question, Fed. R. Crim. P. 16(b)(1)(C), says that if (at defense request) the prosecution discloses details of expected expert testimony, then the defense must do so too, revealing "the witness's opinions, the bases and reasons for those opinions, and the witness's qualification". (At the time of trial, this was Rule 16(d)(1)(C); the subsequent changes in numbering and language are not material.) The rule requires "a summary of the expected testimony, not a list of topics." *United States v. Duvall*, 272 F.3d 825, 828 (7th Cir. 2001). The Rettenbergers contend that, by requir-ing a witness who disclosed before trial that he will support proposition X, also to state that he will disagree with persons who have concluded not-X, the district court has required a pointless exercise and unduly weakened Kelly's testimony (for a jury may discount the conclusions of an

expert witness who has failed to consider divergent views).

Whether pretrial disclosure would have been senseless depends on what Kelly would have said, had he been allowed to answer the questions. If Kelly planned to do nothing more than reiterate his own diagnosis, then further disclosure would have been a waste of time. But if Kelly had scientific reasons for thinking that Viner, Caldwell, and Morris used unreliable techniques, or implemented good techniques in slipshod ways, then disclosure could have been valuable. It would have enabled the prosecutor (who is no medical expert) either to ask Viner, Caldwell, and Morris about those points before trial, or to engage another expert to evaluate Kelly's contentions. Yet we do not know what reasons Kelly would have given, because defense counsel did not make an offer of proof. That scuttles their position, for "[e]rror may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and . . . [i]n case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." Fed. R. Evid. 103(a)(2). Kelly's bottom line may have been "apparent from the context within which [the] questions were asked", but the "substance" of his potential testimony was not (and is not) known. Cf. *United States v. Vest*, 116 F.3d 1179, 1189 (7th Cir. 1997) (offer of proof unnecessary if the substance of the excluded testimony may be found in the record). The district court's ruling therefore may not be disturbed.

Likewise the judge was entitled to prevent evasion of this ruling by sustaining an objection to the use of Kelly as a conduit to introduce the opinion of a non-testifying expert on a subject foreclosed (to Kelly) by the lack of pretrial disclosure. Nor did the judge commit plain error in informing the jury that the objection to Kelly's testimony had been sustained "on the basis of lack of disclosure". Although

jurors might have interpreted this as denigrating Kelly—the statement does not reveal who was responsible for the shortcoming—the judge doubtless would have cleared up the ambiguity if counsel had pointed it out, which they did not.

Another of defendants' evidentiary contentions is that the district judge erred by excluding, as hearsay, the contents of a tape recording. During the investigation, an agent posing as a Social Security worker interviewed Randall about his status. Randall spoke haltingly and disclaimed any ability to concentrate or exercise good judgment, even in household activities. Along the way, Randall mentioned that he had tried to be useful in a real estate development project that some friends were running, though he also said that his confusion had hindered his efforts to assist. Randall wanted to put this taped conversation into evidence to show that, contrary to the prosecution's contentions, he had revealed his involvement in the development.

It is not clear that the tape was relevant for the purpose Randall had in mind. It does not show a proper disclosure (in the administrative process), let alone a timely or candid one; Randall portrayed himself as a hanger-on apt to do more harm than good (a position supporting his claim to be disabled) rather than as the principal developer of the subdivision. But the district judge did not exclude the tape under Fed. R. Evid. 402; he held instead that it was hearsay that must be excluded under Rule 802. That was a mistaken assessment. Randall did not offer these aspects of the conversation as out-of-court statements "to prove the truth of the matter asserted"—the definition of hearsay, see Rule 801(c). He offered them not to show that he *was* a bumbling camp follower to the project, but to show that he had mentioned the development at all and thus belatedly had alerted the Social Security Administration to a fact missing from his application for disability benefits. That was not

a hearsay use. Still, the judge was right to sustain the objection, because Randall offered the whole tape, not just the portion dealing with the real estate development. The remainder of the tape was full of Randall's descriptions of his limited abilities, which could have been relevant *only* for the truth of Randall's narration. Playing the full tape for the jury would have been equivalent to permitting Randall to testify without cross-examination. (He did not take the stand at trial.) When the prosecutor objected, counsel did not propose to redact the tape. The district judge's handling of this matter thus does not undermine the judgment.

Unlike Randall, Julie did testify. When she was done, Randall's lawyer sought to cross-examine her. The district judge said no, because he viewed Julie as a witness favorable to Randall's position. Counsel's vow to forswear the usual tools of cross-examination (argumentative and leading questions) did not move the judge to change his mind. Randall now insists that some of Julie's testimony was adverse to his interests, and that he was therefore entitled to cross-examine Julie under the sixth amendment's right to confront one's accusers. Julie testified, for example, that Randall went hunting, and that the couple jointly decided to take out some of the disability policies only a short time before Randall's fall, which could imply that acquisition of the policies was part of a fraudulent scheme. (The testimony hurt Julie too: the jury did not believe it, and the judge added two levels to her sentence after concluding that she obstructed justice by committing perjury.) Thus Randall had a constitutional entitlement to examine Julie under oath. But a court is entitled to determine when this should occur. The judge must have thought that the jury would gain a clearer understanding if Randall's lawyer examined Julie during Randall's portion of the case. In other words, the judge postponed, but did not preclude, Randall's examination of Julie. This was a sensible decision, enabling each of the defendants to make a more focused presentation

(running three weeks, this was already a lengthy trial) and helping the jury to see that in the main Julie's testimony was favorable to Randall, even though it may have shored up the prosecution's case in some respects. When the time came for Randall to present a defense, however, his lawyers elected not to put Julie back on the stand. That decision, like one to forgo cross-examination of a witness for the prosecution, was a legitimate defense option. Randall had the rights granted by the sixth amendment—the opportunity to confront Julie during trial and to have compulsory process to produce evidence in defense—and chose not to use them.

In closing argument, the prosecutor lampooned the Rettenbergers' defense as a contention that Randall had what the prosecutor labeled a "magical mystery disease." The point was that the clouds in Randall's mind cleared whenever he wanted to ski, raft, hunt, drive, or develop real estate, but returned whenever he saw a physician or contemplated employment. The phrase "magical mystery disease," used to encapsulate the line of argument, could be understood as inviting the jurors to take an anti-intellectual stance and reject medical testimony just because the jurors believe a particular set of symptoms unlikely, or because the syndrome does not have a Latin name or an associated drug. Strip out the phrase, however, and the logic remains: even if bewilderment or vocal slurring comes and goes (many people with brain injuries have lucid periods), the timing of Randall's competent and confused states was just too convenient. One unfortunate phrase after a three-week trial does not turn jurors' heads; it is hard to believe that any juror who had paid attention to the testimony and instructions could have been switched onto a bad track by this turn of phrase. The district court's decision overruling the defense objection to the use of this phrase, if it was error, was harmless.

As for the sentences: each withstands the Rettenbergers'

appellate arguments.

When calculating the intended loss (that is, the loss the insurers would have suffered if the Rettenbergers had not been caught, see U.S.S.G. §2B1.1 Application Note 2(A)(ii)(I)), the district judge assumed that Randall would have continued faking disability until he reached 65, the age at which most policies' coverage ended. The Rettenbergers complain that this is not supported by any evidence, but we do not see why evidence beyond the facts of the crime and the terms of the policies was needed. Randall set out to take the insurers for all they were worth, and that meant benefits through age 65. What would have induced him to disclaim benefits earlier? The Rettenbergers have no answer to that question, which means that the district court did not commit a clear error. See *United States v. Haber*, 251 F.3d 881, 992-93 (10th Cir. 2001).

The district judge increased each defendant's offense level by two after concluding that "sophisticated means" had been used to bilk the insurers. According to U.S.S.G. §2B1.1(b)(8)(C) Application Note 6, and its predecessor §2F1.1(b)(6)(C) Application Note 18 (2000), means are "sophisticated" when they entail "especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense." The Rettenbergers depict their scheme as a simple lie, but it was significantly more detailed. Fooling a skilled neurologist and 14 insurers requires intricate maneuvers. The Rettenbergers had to present a picture consistent with the injury Randall supposedly suffered: Julie had to describe the conduct both in writing and in interviews with physicians, and Randall had to mimic it on demand. Careful execution and coordination over an extended period enabled the Rettenbergers to bilk more insurers and reduce the risk of detection. That Randall eventually slipped up, and that the deception was

caught as a result of his errors plus the private investigation, does not make the scheme any the less complex. The district judge did not commit a clear error in concluding that this scheme meets the Guidelines' definition of sophistication.

Finally, Randall objects to the judge's decision to sentence him at the top of the 46 to 57 month range prescribed by the Guidelines' cross-table. The judge concluded that Julie obstructed justice by lying on the stand (a decision not contested on appeal). As he believed that the Rettenbergers were partners in fraud, he also believed that they were partners in this attempt to deceive the jury. Instead of adding two levels to Randall's offense severity, the district judge elected to sentence Randall at the top of a range that had been calculated without an obstruction-of-justice enhancement. Randall contends that neither a direct nor an indirect means to hold him accountable for Julie's perjury is appropriate, but this contention is not open to appellate review. The district court imposed a sentence within a properly determined range, and as the range did not exceed 24 months the judge had discretion to select a sentence without needing to justify the choice to the court of appeals. See 18 U.S.C. §3553(c)(1). A sentence within a properly determined range does not violate any legal rule and thus does not justify reversal. See 18 U.S.C. §3742(a). A judge who did not need to give a reason, but volunteered a legally forbidden one such as race or an irrational reason, would reveal a violation of law, and we would have authority to remand for resentencing. But no rule of law (and no provision in the Guidelines) forbids a judge to hold one defendant accountable for another's misconduct that was conducted according to their mutual plan. Whether such a plan actually existed is not a question of law that would support appellate review of an in-range sentence.

AFFIRMED

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*

USCA-02-C-0072—9-25-03