In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1902

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JOHN CHAMNESS,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 30030—**Jeanne E. Scott**, *Judge.*

ARGUED OCTOBER 27, 2005—DECIDED JANUARY 25, 2006

Before RIPPLE, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* John Chamness pled guilty without the benefit of a written plea agreement to two counts of knowingly attempting to manufacture a mixture or substance containing methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 846. The presentence investigation report, applying the November 1, 2004, version of the United States Sentencing Guidelines, determined that Chamness had a total offense level of 32 and a criminal history category of IV. This calculation, adopted by the district court, included a three-level increase in Chamness's offense level pursuant to U.S.S.G. § 2D1.1(b)(6)(B) for creating a substantial risk of harm to human life or the environment during his attempt to

manufacture methamphetamine. Chamness appeals the enhancement. We affirm.

## I.  HISTORY

The basis of Chamness's appeal centers around Count 2 of the indictment, so we recount only the facts relevant to this count. On July 31, 2003, Deputy Chief Ron Burke of the Taylorville, Illinois, police department was called to a mobile home located in a trailer park. The trailer's owner had reported that people were attempting to enter it. Burke and other officers arrived and met with the owner, who said people were in the trailer, were manufacturing methamphetamine, and were threatening to harm him.

Burke was the first officer to enter the small trailer. He smelled a strong odor of ether and saw a white fog that "took up the whole entire living room/kitchen area." He also saw glass jars with tubes sticking out and containing a white substance. At this point, people began to flee. Several individuals, including Chamness, were caught, while others escaped. Authorities suspected that the mobile home was being used as a clandestine methamphetamine laboratory. Therefore, in accordance with standards established by the Drug Enforcement Administration, the police left the trailer and arranged for a hazardous waste disposal team to secure it. A later search of the laboratory revealed two glass jars containing 923 milliliters of liquid that contained methamphetamine, one gallon of muriatic acid, a one gallon container of Coleman stove fuel, peeled lithium batteries, an operating air pump, and 26 ounces of salt.

Chamness pled guilty to two counts of attempting to manufacture methamphetamine. At sentencing, the court heard detailed testimony from Sanford Angelos, a DEA forensic chemist. Angelos explained Chamness was engaged in a second gassing of the liquid, in which hydrochloric acid is used to extract methamphetamine left behind after the

completion of the first process. While the first stage of cooking had produced approximately 90 grams of methamphetamine, there was no evidence that Chamness was present during this first cook. The second gassing was able to produce only two or three grams, although the second gassing requires a higher level of expertise. Chamness concedes he was involved in this second gassing stage.

The district court applied the three-level enhancement for creating a substantial risk to human life, over Chamness's objection. The court discussed each of the required factors in making this determination, and explained that it does not give this enhancement in all methamphetamine cases. The resulting sentencing range of imprisonment was 168 to 210 months, and the court sentenced Chamness to 168 months' imprisonment on each count, to run concurrently.

## II. ANALYSIS

We review the district court's interpretation of the Sentencing Guidelines de novo. *United States v. Ewing*, 129 F.3d 430, 434 (7th Cir. 1997) (citation omitted); *United States v. Wilson*, 98 F.3d 281, 282 (7th Cir. 1996) (citation omitted). However, we review its factual findings underpinning the enhancement for clear error. *United States v. Blalock*, 321 F.3d 686, 689-90 (7th Cir. 2003) (citation omitted); *United States v. Johnson*, 227 F.3d 807, 812-13 (7th Cir. 2000) (citations omitted). A finding of fact is clearly erroneous only if, based upon the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Johnson*, 227 F.3d at 813 (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

As an initial matter, we note the parties made no mention of whether Chamness's ultimate sentence was reasonable. Although it was not mandatory for Chamness to be sen-

tenced in accordance with the Guidelines, sentencing courts must continue to give consideration to them. *See United States v. Booker*, 125 S. Ct. 757, 764-65 (2005). "The Sentencing Reform Act requires resentencing when the challenged sentence was 'imposed as a result of an incorrect application of the sentencing guidelines.'" *United States v. Scott*, 405 F.3d 615, 617 (7th Cir. 2005) (quoting 18 U.S.C. § 3742(f)(1)). As we have stated, this provision survived *Booker*. *Id.* (citing *Booker*, 125 S. Ct. at 764). Therefore, "[a]n incorrect application of the guidelines requires resentencing under the post-*Booker* sentencing regime." *Id.* (citation omitted); *United States v. Skoczen*, 405 F.3d 537, 548 (7th Cir. 2005) ("Even under an advisory regime, if a district court makes a mistake in calculations under the Guidelines, its judgment about a reasonable sentence would presumably be affected by that error and thus (putting aside the implications of plain error review) remand would be required just as before."). Chamness may have made a valid tactical decision to focus all of his energies on appeal on the risk to human life enhancement. In any event, as explained later, we find Chamness's sentence is reasonable under the circumstances.

## A. The Application of § 2D1.1(b)(6)(B)

Congress has found that the manufacture of methamphetamine "poses serious dangers to both human life and to the environment," and it is "unstable, volatile, and highly combustible." H.R. Rep. No. 106-878(I), at 22 (2000). As a result, Congress enacted the Methamphetamine Anti-Proliferation Act of 2000 (the "Act"), which provided that the United States Sentencing Commission "shall . . . increase the base offense level . . . by not less than 3 offense levels above the applicable level in effect on the date of the enactment of this Act" for any methamphetamine manufacturing offense that "created a substantial risk of harm to human life." Pub. L. No. 106-310, § 3612 (a)(2), 114 Stat.

1227, 1229 (2000). In response, the Commission added a three-level increase in § 2D1.1(b)(6)(A), now found at § 2D1.1(b)(6)(B), *see* U.S.S.G. app. C, amends. 608, 620, 667, which provides that if an offense involved the manufacture of methamphetamine and created a substantial risk of harm to human life (other than a minor or incompetent) or to the environment, then the offense level should be increased by three levels. Chamness now appeals the role this enhancement played in the determination of his ultimate sentence.

While the Act did not define "substantial risk of harm," the relevant Guideline's commentary lists the following factors that a court must consider when determining the existence of a substantial risk of harm:

> (i) The quantity of any chemicals or hazardous or toxic substances found at the laboratory, and the manner in which the chemicals or substances were stored.

> (ii) The manner in which hazardous or toxic substances were disposed, and the likelihood of release into the environment of hazardous or toxic substances.

> (iii) The duration of the offense, and the extent of the manufacturing operation.

> (iv) The location of the laboratory (e.g., whether the laboratory is located in a residential neighborhood or a remote area), and the number of human lives placed at substantial risk of harm.

U.S.S.G. § 2D1.1, cmt. n. 20. We turn now to a review of each of these factors.

### 1. Quantity of Chemicals or Hazardous or Toxic Substances and the Manner of Storage

Chamness emphasizes he was found performing only a second gassing of the methamphetamine, and not per-

forming the more dangerous initial production of methamphetamine that involves the use of anhydrous ammonia. Therefore, the process in which he was engaged in did not involve any ammonia, and only 3 grams of methamphetamine in total were being produced. However, a review of the chemicals and hazardous or toxic substances found in the trailer reveals the factor weighs in favor of applying the enhancement.

The police discovered an operating laboratory upon entering the trailer. Chamness was attempting to "gas off" a liquid containing ether or Coleman fuel. Hydrochloric gas is used during this process. Specifically, the police recovered one gallon of muriatic acid, one gallon of Coleman fuel (or ether), salt, and glass jars containing a liquid, which in turn, contained methamphetamine.

Coleman fuel is flammable and can be explosive. *United States v. Layne*, 324 F.3d 464, 470 (6th Cir. 2003); *see also United States v. Dick*, 173 F. Supp. 2d 765, 767 (E.D. Tenn. 2001). Muriatic acid is toxic and can cause severe burns. *Layne*, 324 F.3d at 470. The acid and salt are combined to create hydrochloric acid, and the evidence before the district court indicated such an acid is a strong irritant of the eyes, mucous membranes, and skin. With respect to the methamphetamine itself, evidence before the court indicated that police officers handling suspects at a laboratory, even for very short periods of time, can become contaminated with methamphetamine, and unknowingly carry this material away from the scene and expose their own families. Perhaps most importantly, ether was being burned at the time the police entered the trailer, creating a white fog that engulfed the trailer and created a strong odor. Burke testified he and the other officers were forced to exit the trailer because in his experience, continual contact (presumably in such a confined space) with such a fog and odor would cause him to become queasy and ill. There was also testimony that exposure to ether can adversely affect a person's health.

Taken together, this amounted to unrebutted evidence the ether cloud was hazardous and/or toxic. Ether is highly flammable as well. Ultimately, due to the presence of the various chemicals and substances, a hazardous waste disposal team was contacted to enter and dismantle the laboratory, in accordance with standards established by the Drug Enforcement Administration. While the manner of storage is indeterminate in this case, we find that the quantity of the chemicals and hazardous or toxic substances was such that it militates in favor of applying the enhancement. *See Layne*, 324 F.3d at 470 (finding presence of similar chemicals capable of manufacturing a couple of ounces of methamphetamine inherently dangerous so as to weigh in favor of applying the enhancement).

### 2. *Manner of Disposal and Likelihood of Release into the Environment*

The government concedes, as it must, that it did not introduce any evidence concerning how Chamness disposed (or intended to dispose) of any hazardous or toxic chemicals. Nor was there any evidence introduced upon which the court could have evaluated the likelihood of release into the environment of hazardous or toxic substances. Therefore, this factor is indeterminate. *See United States v. Davidson*, 409 F.3d 304, 313-14 (6th Cir. 2005) ("In regard to the second factor, . . . an absence of evidence of plans for proper disposal is not itself sufficient to make the second factor weigh in favor of applying the enhancement.") (citing *Layne*, 324 F.3d at 470).

### 3. *Duration of the Offense and the Extent of the Manu-facturing Operation*

Chamness's entire argument on this factor is as follows. "The third factor (the duration of the offense) must weigh against the enhancement since the evidence showed

Mr. Chamness was only involved in the second re-gassing stage of manufacturing which is only one short step in the process. There is no evidence that he ever was involved in an extensive cooking operation." First, we note the argument is simply a cursory legal analysis, one that contains not one factual or legal citation. Second, Chamness's argument completely ignores the second part of the factor, which concerns the extent of the manufacturing process. This part of the factor, of course, does not concern the extent of Chamness's involvement in the manufacturing process, as his argument suggests; rather, the relevant inquiry concerns the extent of the manufacturing process itself.

In this case, the evidence clearly demonstrated that the extent of the manufacturing process was significant. For example, the undisputed evidence was that the manufacturing operation exhibited "a level of sophistication [law enforcement personnel] normally don't see." Upon entering the trailer, the police found tubing attached to both an operating pump and to one of the glass jars of liquid located on the kitchen counter. The government's expert witness testified this particular method of gassing off the ether solution to extract the methamphetamine is not only efficient, but also rare, as it has only been found in five percent of clandestine laboratories. The witness further testified that only 30 percent of methamphetamine manufacturers are sophisticated enough to perform a second gassing of the liquid mixture. We agree with the government that the manufacturing operation's level of sophistication is evidence that the operation's extent was considerable. While the evidence may be lacking with respect to the duration of the offense, and this may weigh in favor of Chamness, we find the second part of this factor significantly outweighs any benefit Chamness might enjoy.

### *4. Location of the Laboratory and the Number of Human Lives Placed at a Substantial Risk of Harm*

The location of the trailer was within a mobile home trailer park. Details are sketchy as to the specifics of the trailer park (i.e., the number and proximity of other trailers). However, Chamness does not dispute the finding of the district court that the area was a residential area, as opposed to a remote one, a distinction that is at least relevant. *See Layne*, 324 F.3d at 471 ("The Guidelines make the distinction between 'residential neighborhood' and 'remote area' relevant, if not important."). But given the lack of evidence regarding any further details, this part of the factor does not weigh heavily against Chamness.

However, the second part of this factor concerns the number of lives placed at a substantial risk of harm. The Guidelines do not require the sentencing court to find that these individuals were *actually harmed* by the manufacturing operation; rather, the court only needed to find that their lives were placed at substantial *risk* of harm. First, there were several people at a risk of some type of harm, namely Chamness, the police officers who arrived on the scene, the staff of the laboratory who cleaned up the site, the owner of the trailer who called police, and Chamness's cohorts, which includes those who fled and those who were apprehended. We further find these lives were placed at a substantial risk of harm. As detailed above, ether was being burned and was present in the air. There certainly was an inhalation risk to these individuals. Also, some of the chemicals and hazardous or toxic substances were flammable and/or explosive. Given their close proximity within the trailer and their proximity to the actual gassing operation, the individuals were placed at a substantial risk of harm, namely serious injuries from an explosion or a fire.

*B.  Reasonableness of Sentence*

Finally, as alluded to earlier, Chamness does not argue that his prison sentence was unreasonable. A sentence within a properly calculated guideline range, as is the case here, is presumptively reasonable, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), and Chamness does not identify any factor under 18 U.S.C. § 3553(a) that might allow us to conclude that the district court was obligated to impose a lower sentence. Therefore, Chamness does not rebut the presumption that his Guidelines sentence was reasonable. *See id.*

## III.  CONCLUSION

Viewing the first, third, and fourth factors together, we find the laboratory placed numerous people at substantial risk of serious harm. Chamness's sentence was reasonable, and his sentence is AFFIRMED.

A true Copy:

Teste:

*_____*
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*