In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-1357

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

SCOTT C. REDMAN,

*Defendant-Appellant.*

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division
No. 1:16-cr-00079-1 — **Samuel Der-Yeghiayan**, *Judge.*

_____

ARGUED JANUARY 11, 2018 — DECIDED APRIL 17, 2018

_____

Before EASTERBROOK AND BARRETT, *Circuit Judges* and
STADTMUELLER, *District Judge.*[*]

STADTMUELLER, *District Judge.* From September 2015 until
his arrest in February 2016, Scott Redman posed as a psychi-
atrist at a Chicago medical clinic using the name and license
number of Dr. Julian Lopez Garcia. He "treated" patients

_____

[*] Of the Eastern District of Wisconsin, sitting by designation.

who suffered from a variety of mental illnesses, and he "prescribed" a variety of controlled substances. Redman is not a doctor; indeed, he did not attend school past the tenth grade.

A jury found Redman guilty of wire fraud, aggravated identity theft, furnishing false and fraudulent material information in documents required under the federal drug laws, and distributing controlled substances. The district court sentenced Redman to 157 months' imprisonment for these offenses.

On appeal, Redman does not contest his convictions, but he claims that the district court erred in determining the appropriate sentence. Finding no error in Redman's sentence, we affirm the decision of the district court.

## I. HISTORY

Scott Redman identified himself as Dr. Julian Lopez Garcia when he responded to an advertisement for an open psychiatry position at Clarity Clinic, a downtown Chicago mental health clinic. He submitted a *curriculum vitae* in which he claimed to have attended the University of Connecticut for undergraduate and medical school, as well as a residency, and that he was licensed to practice medicine in the state of Illinois. In mid-September 2015, Redman interviewed with the clinic owner, Dr. Pavan Prasad, to whom he recited the lies listed on his *curriculum vitae.* At the close of the interview, Dr. Prasad offered him a job.

Redman initially declined the offer, but at the end of October 2015, he reached out to Dr. Prasad and accepted a contract position at Clarity Clinic as a psychiatrist. Prior to commencing employment, Redman provided falsified documentation of his credentials: an employment application,

payroll application, I-9 Employment Eligibility Verification form, W-9 form, photograph of an Indiana driver's license with Redman's picture, photocopy of an Illinois medical license, photocopy of a medical school diploma, a residency certificate for training in psychiatry, and a photocopy of a social security card.

He enlisted the help of online counterfeiting services ("fakediplomanow.com," for example) to create some of these falsified documents. Each bore the name of Julian Lopez Garcia. In addition, Redman submitted an online Drug Enforcement Administration Form 224 using false information to obtain a DEA registration number, thereby enabling him to prescribe controlled substances. He obtained malpractice insurance by using false information as well.

During his approximately two-and-a-half months of employment at Clarity Clinic, Redman "treated" patients with a combination of therapy and controlled substances. He issued approximately 92 prescriptions for controlled substances to 57 patients. Unsurprisingly, the government's trial presentation included evidence that Redman made errors in his practice, particularly with respect to prescriptions.

In one instance, Redman prescribed 5 milligrams of a particular controlled substance, benzodiazepine, for which a normal dosage is in the range of .5 milligrams. Dr. Prasad testified that any dosage of benzodiazepine for the particular patient to whom Redman prescribed it was concerning because of the patient's previous history of addiction. Another patient, whom Redman diagnosed with two mental illnesses treatable with two prescription medications, testified at trial that she later saw a real doctor who determined she had

been completely misdiagnosed and changed her medications.

The clinic attributed Redman's mistakes to his being a recent graduate, a "little rusty" on fundamentals that he would eventually correct. At trial, Dr. Prasad testified that he thought Redman was doing a "decent job." By the end of his time at Clarity Clinic, Redman was seeing nearly a dozen patients a day.

Dr. Prasad also testified that Redman often reminisced about his days in residency, and that Redman attended professional functions at which he would chat with other physicians about his experience and interest in certain areas of medicine.

Local authorities, and later the federal government, were alerted to Redman's scheme when the real Dr. Julian Lopez Garcia reported that someone had used his State of Illinois medical license number to obtain a DEA registration number in his name. Redman was charged in a ten-count indictment with three counts of wire fraud in violation of 18 U.S.C. § 1343, one count of aggravated identity theft in violation of 18 U.S.C. § 1028A(a)(1), one count of furnishing false and fraudulent material in an application filed under Title 21 of the United States Code in violation of 21 U.S.C. § 843(a)(4)(A), and four counts of distributing a controlled substance in violation of 21 U.S.C. § 841(a)(1). Redman proceeded to trial and was convicted by a jury on all counts.

The probation officer who prepared Redman's presentence investigation report recommended grouping the wire fraud counts together with the false statements count, pursuant to U.S.S.G. § 3D1.2. All counts for distribution of a

controlled substance were also grouped. The aggravated identity theft count was not grouped.

Various enhancements were applied in the calculation for the offense level for each group, and the combined adjusted offense level was 31. Coupled with a criminal history category of II, Redman's sentencing Guidelines range was 121 to 151 months' imprisonment, with a mandatory two-year consecutive term of imprisonment for the aggravated identity theft count.

At sentencing, Redman objected to enhancements for the monetary loss amount, the number of victims, the use of sophisticated means, his conscious or reckless disregard for the risk of death or injury to patients, his abuse of trust, and the involvement of vulnerable victims. The district court overruled his objections, adopted the Guidelines calculation as presented in the presentence report, and imposed a sentence of 157 months' imprisonment.

## II. ANALYSIS

Redman's appeal challenges the district court's application of only two of the above-noted enhancements, both applied to the offense level for the grouping of counts for wire fraud and false statements: a two-level enhancement for use of sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C), and a two-level enhancement for conduct that involved a conscious or reckless disregard of a risk of death or serious bodily injury under U.S.S.G. § 2B1.1(b)(15)(A).

We review the district court's interpretation of the sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Fletcher*, 763 F.3d 711, 715 (7th Cir. 2014). The determinations that Redman's conduct involved

sophisticated means and posed a conscious or reckless risk of serious bodily injury are findings of fact, and we therefore review for clear error. *United States v. Wayland*, 549 F.3d 526, 528 (7th Cir. 2008) (sophisticated means); *United States v. Vivit*, 214 F.3d 908, 920 (7th Cir. 2000) (risk of serious bodily injury). "A finding of fact is clearly erroneous only if, based upon the entire record, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Gallardo*, 497 F.3d 727, 740 (7th Cir. 2007) (quoting *United States v. Chamness*, 435 F.3d 724, 726 (7th Cir. 2006)).

### A. Sophisticated Means

We turn first to Redman's challenge to the "sophisticated means" enhancement. Section 2B1.1(b)(10)(C) calls for a two-level upward adjustment if the offense "involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means."

The application note for this subsection defines "sophisticated means" as:

> especially complex or especially intricate offense conduct pertaining to the execution or concealment of an offense. For example, in a telemarketing scheme, locating the main office of the scheme in one jurisdiction but locating soliciting operations in another jurisdiction ordinarily indicates sophisticated means. Conduct such as hiding assets or transactions, or both, through the use of fictitious entities, corporate shells, or offshore financial accounts also ordinarily indicates sophisticated means.

U.S.S.G. § 2B1.1, Cmt. 9(B); *see also United States v. Stitman*, 472 F.3d 983, 987 (7th Cir. 2007) (Guidelines application notes are binding authority). The note's list of examples is not exhaustive; it "reflects that a wide range of criminal conduct might be deemed sophisticated." *United States v. Allan*, 513 F.3d 712, 715 (7th Cir. 2008).

The district court found application of the sophisticated means enhancement was appropriate based on the "ample evidence showing that the defendant caused the creation of a substantial amount of paperwork, including fake diplomas, fake resumes, and fake unauthorized licenses and made government filings in order to further and conceal his elaborate scheme." (Docket #105 at 16).

Redman insists that his conduct was not more complex than typical fraud. *See United States v. Ghaddar*, 678 F.3d 600, 602 (7th Cir. 2012) ("[T]he adjustment for sophisticated means is warranted only when the conduct shows a greater level of planning or concealment than a typical fraud of its kind.") (internal quotation omitted). He argues, for example, that the falsified documents were obtained from a decidedly unsophisticated website. Further, his scheme was not prolonged, the only other people he involved were the anonymous individuals behind the websites hawking fake documents, and discovery of his scheme did not require a private investigator.

The facts of this case clearly warrant application of the sophisticated means enhancement. Redman's scheme parallels conduct that we have previously deemed "sophisticated." *See, e.g., United States v. Anobah*, 734 F.3d 733, 739 (7th Cir. 2013) (defendant used straw purchasers and created false loan applications and false documents to support the

misinformation in the false loan applications); *Allan*, 513 F.3d at 716 (defendants used fictitious business entities, doctored fax headers, and fashioned phony e-mail addresses to resemble legitimate contact information); *United States v. Rettenberger*, 344 F.3d 702, 705 (7th Cir. 2003) (defendants submitted falsified documents to insurers and the federal government to obtain disability benefits); *cf. United States v. Wu*, 81 F.3d 72, 73–74 (7th Cir. 1996) (finding sophistication under § 2T1.1(b)(2), the analog of § 2B1.1(b)(10)(C) in tax fraud cases, where defendant falsified business records, used false names, and provided misleading tax information).

*Rettenberger* is particularly apposite. Rettenberger, along with his wife, defrauded insurers and the Social Security Administration by pretending, in writing and in interviews, that he was disabled. *Rettenberger*, 344 F.3d at 705. As we noted in that case, "[f]ooling a skilled neurologist and 14 insurers requires intricate maneuvers." *Id.* at 709. Redman's conduct required planning and deception sophisticated enough to fool Dr. Prasad and the clinic's patients and involved devious maneuvers at least as intricate as those in *Rettenberger*.

Finally, that Redman's scheme only lasted a couple of months and involved a primitive counterfeiting website does not, in this case, diminish its sophistication. *See Ghaddar*, 678 F.3d at 602 ("[N]ot all of [the defendant's] actions needed to be elaborate for the adjustment to apply; it is enough that, as the district court found, his actions when viewed as a whole constituted a sophisticated scheme.").

Redman's conduct involved a series of complicated and elaborate theatrics to commit and conceal his criminal con-

duct. The district court did not clearly err in finding that Redman's scheme involved sophisticated means.

B. *Conduct Involving Conscious or Reckless Risk of Death or Serious Bodily Injury*

We turn next to Redman's challenge to the application of the enhancement for placing patients at risk of death or serious injury. Section 2B1.1(b)(15)(A) calls for a two-level upward adjustment if the offense involved "the conscious or reckless risk of death or serious bodily injury."

"Serious bodily injury" is a phrase of general applicability used frequently throughout the Guidelines and means "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. § 1B1.1, Cmt. 1(L). Actual injury need not occur for the enhancement to apply. *Vivit*, 214 F.3d at 921.

In applying this enhancement, the district court emphasized that Redman's patients, who had serious psychiatric problems, relied on him to diagnose and treat their illnesses. Redman had absolutely no training to equip him to do that. His conduct, both in what he did to treat patients and what he might have missed because of his lack of training, put his patients at risk.

Similarly, the government argues on appeal that the risk of addiction and even death from mis-prescribed medications, along with the risk that a misdiagnosis of a patient with a serious mental illness could lead to serious harm to the patient or others, falls squarely within the standard for "serious bodily injury." U.S.S.G. § 1B1.1, Cmt. 1(L).

The real Dr. Julian Lopez Garcia penned a letter that was read at sentencing, stating that "[e]very time a prescription is written, the physician has to weigh the benefits, risks, adverse reaction profile and potential benefit for the patient. Also, the doctor has to prescribe a precise dose and evaluate possible interactions with other medications. It is a complex process but if done incorrectly can have serious implications in the health of a patient and can even cause their demise. … Mr. Redman put every patient's life at stake when he recklessly decided to treat and write prescriptions under my name." (Docket #105 at 9).

Redman argues that, despite his lack of medical training or credentials, he was capable of acting as a psychiatrist and prescribing controlled substances in a way that did not cause a risk of serious injury. He made a similar argument at his sentencing hearing, noting that 150 years ago, there were no formal licensing requirements for medical treatment providers and those providers were nonetheless competent to do their jobs.

This argument strains credulity. Of course, Redman not only lacks the requisite credentials, he lacks any training or knowledge about the practice of medicine. And, as the district court aptly noted, Redman's crimes did not occur 150 years ago. Redman committed his crimes at a time when educational and licensing requirements were in place to protect patients from potential harm from unqualified people like Redman.

Indeed, Redman's conduct was more egregious than that of other defendants whose conduct we have found warranted this enhancement. *See, e.g.*, *United States v. Jimenez*, 41 F. App'x 1, 4 (7th Cir. 2002) (defendant podiatrist prescribed

painkillers and anxiety medications to patients who did not need them); *Vivit*, 214 F.3d at 920 (defendant physician failed to perform physical examinations on patients who visited him following automobile accidents and failed to perform certain basic diagnostic tests, such as taking blood pressure, on other patients who later proved to be at risk). Unlike Vivit and Jimenez, Redman is not a trained and licensed medical professional who performed his duties with criminal negligence. He is a high-school dropout fraudster.

Finally, Redman argues that the district court erred by relying on "speculation" in determining whether Redman's conduct involved the conscious or reckless risk of death or serious bodily injury. He points to the judge's observation at sentencing that "no one knows the long-term harm caused by [Redman's] actions." (Docket #105 at 17). But Redman's argument misses the mark, because the enhancement applies in cases involving a *risk* of serious injury, not proof of actual injury. Although it is true that sentencing determinations must be based on "reliable evidence, not speculation or unfounded allegations," *United States v. Bradley*, 628 F.3d 394, 400 (7th Cir. 2010), the district court in this case relied on ample evidence that Redman exposed his "patients" and others to the risk of tragic harm.

The district court did not clearly err by concluding that Redman recklessly created a serious risk of bodily injury.

### III. CONCLUSION

For the foregoing reasons, we find no error in the district court's application of the sentencing enhancements about which Redman complains. Accordingly, the decision of the district court is AFFRIMED.